BIANCHI and others, Plaintiffs in error, vs. THE STATE, Defendant in error.

*March 7—April 2, 1919.*

*Criminal law and practice: Assault with intent to murder: Conspiracy: Evidence: Competency: Sufficiency: Reversal of conviction: Discharge of defendants sufficiently punished: Harmless errors: Arguments to jury: Attitude of trial judge: Milwaukee district court: Powers of clerk: Warrants: Information: Change of venue: Discretion: Constitutional law: Self-incrimination: Sworn examination of accused persons by district attorney: Instructions to jury.*

1. Upon the trial of several persons for an assault with intent to murder, a conspiracy on the part of all to make the assault may be shown. If such conspiracy is established it becomes a matter of secondary importance just what part each defendant took in carrying it out; but if it is not established, and there was no concert of action agreed upon or understood before the assault began, it is of the utmost importance to determine just what each defendant said and did at the time of the assault.

2. In proving a conspiracy great latitude in the admission of evidence is permissible, and the limits thereof rest largely in the discretion of the trial court.

3. Upon the question of conspiracy evidence that some, if not all, of the defendants belonged to the same club or circle or home and as to its character is admissible; but proof that defendants were anarchists, or even that they were guilty of criminal anarchy, is not sufficient of itself to prove a conspiracy to murder.

4. If in such a case the proof of conspiracy failed, letters written by one defendant showing an intent on his part and that of others to disturb the meeting at which the assault occurred were admissible in evidence only against the writer.

5. Although defendants or some of them entertained the thought of disturbing such meeting, the execution of that thought

would be only a misdemeanor, and those joining in it could not on that ground be convicted of an assault with intent to murder unless the disturbance contemplated would probably lead to such an assault.

6. The evidence in this case is *held* insufficient to establish a conspiracy to murder; insufficient as to some of the defendants to show that they took part at any time in any assault whatever; insufficient as to others to warrant a conviction of anything more than a simple assault; and sufficient as to others to warrant, in the absence of prejudicial error on the trial, their conviction of an assault with intent to murder.

7. The evidence as to certain defendants having been sufficient to warrant conviction of a minor offense only, and they having been in fact convicted of a graver charge and imprisoned under harsher conditions and for a much longer time than they could have been had they been convicted of the lesser offense, it is *held* that they have been sufficiently punished, and upon reversal of the judgment against them their discharge is directed.

8. Alleged errors as to remarks of counsel for the state in his argument to the jury, as to restrictions upon the cross-examination of witnesses for the state, and as to the attitude of the judge towards defendants' counsel during the trial, are *held* not to have been prejudicial.

9. The clerk of the Milwaukee district court is authorized by sec. 9, ch. 218, Laws 1899, to issue warrants upon complaint filed in writing; and it is not necessary that the record show that the complainant was orally examined under oath, the calls of sec. 4776, Stats., being satisfied by a sworn complaint in writing.

10. Under sec. 4653, Stats., an information may be filed for an offense different from that charged in the complaint upon which a warrant was issued.

11. Four days before the time set for the trial in Milwaukee of persons charged with an assault with intent to murder, a bomb explosion in the central police station killed a number of persons, including two officers who had assisted in the arrest of the defendants at the time of the alleged assault. The newspapers of the city, which circulated generally throughout the state, charged the explosion, if not directly to the defendants (who were in jail), to their friends or nationality. A change of venue, asked on the ground that a fair trial could not be had in Milwaukee county, was refused conditionally. The request was not renewed upon going to trial, and a jury was quickly and easily secured.

Bianchi v. State, 169 Wis. 75.

*Held,* that there was no abuse of discretion in refusing the change.

12. The apparent difficulty or ease of securing a jury may be taken into account in passing upon an alleged abuse of discretion in refusing a change of venue.

13. Transcripts of the testimony of police officers since deceased, taken at the preliminary examinations of defendants, were admissible in evidence at the trial, being received in each instance, as the trial court specifically stated, only as against those defendants at whose preliminary examination the offered testimony was taken; and a subsequent statement in the charge to the jury that such testimony could be considered only as against such defendants "as were present" at the times of such preliminary examinations was not, under the circumstances, misleading.

14. Where certain of the defendants charged with an assault with intent to murder had been taken to the office of the district attorney and, without being advised of their constitutional rights as to self-incrimination, were sworn and examined by him, and their testimony reduced to writing, such proceeding was improper and illegal and such testimony, not having been voluntarily given, was inadmissible at the trial.

15. No damaging facts as to the assault in question being contained in the statements, so taken, of two of the defendants, and it being shown by other evidence, clearly and satisfactorily, that they were active participants in the assault, the admission of their statements was not prejudicial error as to them.

16. Upon a trial for assault with intent to murder, the evidence being insufficient to show a conspiracy and insufficient to show any offense by some of the defendants or more than a simple assault by others, it was error to give instructions to the jury relating to a conspiracy to commit a felony or relating to criminal anarchy as defined in the statutes. As to defendants whose active and deadly participation in the assault was clearly proved the error was harmless; but as to others, against whom the evidence was somewhat meager and uncertain, the error was prejudicial.

ERROR to review a judgment of the municipal court of Milwaukee county: A. C. BACKUS, Judge. *Affirmed in part; reversed in part.*

The plaintiffs in error, hereinafter called the defendants, *Peter Bianchi, Vincent Fratesi, Amedeo Lilli, Adolph Fra-*

*tesi, Louis Serafini, Angelo Pantaleoni, Gavina Denurra, Daniel Belucci, Pasquale Nardini, Mary Nardini,* and *Bartolo Testolin,* were each charged with and convicted of the crime of an assault, being armed with a loaded revolver, with intent to murder, and each was sentenced for a term of twenty-five years in state prison. All the above defendants except *Vincent Fratesi* and *Amedeo Lilli* were also charged with being accessories before the fact of the same offense, in that they unlawfully and feloniously counseled, aided, abetted, and procured *Vincent Fratesi* and *Amedeo Lilli* to commit the assault charged.

It appears from the evidence that on Sunday, August 26, 1917, at about half-past 3 in the afternoon, one August Guliani, a minister, having obtained police permission so to do, held a meeting at the corner of Bishop and Potter avenues in the city of Milwaukee. He had with him part of his own congregation. Two cornets and an organ were played at the meeting. They first played "Columbia" on the cornet and that attracted a crowd of about 100. Among those who came were some of the defendants. Guliani testified that *Mary Nardini, Vincent Fratesi, Amedeo Lilli, Adolph Fratesi, Bartolo Testolin,* and *Gavina Denurra* were there, but he cannot say that he saw any other of the defendants there that afternoon. Those that he saw were standing close together in a group by themselves. After "Columbia" was played the minister started to talk about the war, the draft, and registration, and talked for about ten minutes, when *Gavina Denurra* began to talk aloud and said, "I don't believe in God, I don't believe in priests, I don't believe in government, I don't believe in what you are saying," and every one of the group said "Yes, yes, yes," according to Guliani's testimony. He then asked them to be quiet till the meeting was over and then if they had any questions to ask he would answer them. They were quiet till the meeting was over and then they came around him and started to talk.

*Amedeo Lilli* was the first to speak and he said, "We don't believe in this war," and then there was another man, not a defendant, who said, "You came here because you want to preach about the war, we don't believe in any government, Wilson is a pig, the American flag is a rag, and this country is a jail," and the other defendants said, "You bet, you bet." They then told him that they were anarchists, and he advised them to keep their ideas to themselves or they would get into trouble.    They said, "We don't care for government or police."    He then offered to shake hands with them, but one, not a defendant, said, "We don't want to shake."    "I no shake hands with a man who is bought from the government," and some of the defendants said, "We are the same idea."    The minister and those who came with him then went home.    But before leaving he asked those of the crowd who were pleased with his coming to raise their hands, and most of them did.    ·

On Sunday, the 2d of September, he went there again about half-past 3 or 4 in the afternoon with the same party he had August 26th.    What then happened is thus stated by him:

"On our way from the street car to that corner we saw *Mrs. Nardini,* one of the defendants, sitting outside of her house on Bishop avenue.    She was reading a book and she saw me, closed the book, and ran ahead of us in the direction towards 300 Bishop avenue, where the meeting hall is. When our band reached the corner there was nobody there and our people started to sing 'Columbia' in Italian.    When we reached the corner there was nobody there, but immediately thereafter we saw three of the defendants, *Fratesi, Amedeo,* and *Testolin,* and some more at the same corner where we were standing and they were looking at us very friendly.    No remark passed between us at the beginning and others of these defendants came to that corner, among them *Mary Nardini,* who came with the others and was talking to them.    While we were singing they started a bad song, an anarchistic song, and they stood five or six feet from us

and they were singing this song while we were singing, and I told them 'When you are through let me know, I'll start again,' and they didn't pay any attention to my advice. After ten minutes they were singing and I told Miss Richter to call for police. There were about fifteen in that group, but I remember only four of the defendants, *Mrs. Nardini, Vincent Fratesi, Amedeo Lilli,* and *Testolin.* Miss Richter got the police, who came after five minutes, and I gave my card to the police and then I asked them for protection, and these defendants were present. The police said, 'You go on with your meeting, I will take care of you,' and then I started in to sing again, and after a minute or two they started their anarchistic song again and I asked the police why he did not stop them, and he said, 'I can do nothing with such a crowd.' I was listening to what the four defendants present there were saying; they were standing close together and they talked loud and they said, 'Before it starts to rain go home, otherwise we will kill you.' It did not look like rain, and the lady said, *Mrs. Nardini,* 'Coward, take a gun and shoot them, who is the first?' She said that to her crowd there, about fifteen, and they called me 'coward, a man paid by the government, we do not want to listen about the war because we have our brothers in the war in Italy, we will smash your face, we destroy you and will throw you in the lake if you come again.' I said, 'I am not a coward man, I will be here again, but I will bring police with me to protect me,' and they told me 'we kill you and the police too.' I do not remember the person who said this, but all the crowd there. They were about five or six feet from me and they said it in a loud voice in the Italian language. They started to come near me and were talking all the time, but I cannot remember the words. Then I said, 'For peace sake, go home,' and I closed the organ and went home and four of these defendants followed us for three blocks, the four defendants I had named, and they were saying 'don't come again.' The four defendants named and ten or twelve others followed. A little booklet with a red picture on the cover entitled 'Nuovo Canzoniere Dei Ribelli,' and a poem on page 5 I saw and I heard that song on page 5 sung by the four defendants I have named. I can translate the Italian language of that song into English and the paper shown me contains a true and correct translation of the Italian song which was sung by those defendants

on that day.    I heard two or three stanzas of that song.    I heard them sing

> We are the sons of work,
> We fight for bread,
> The proud heroes of gold,
> We beseech yet in vain,
> We fight against all citizens,
> And we fight the citizens,
> We fight, we fight, we fight for anarchy,
> Down with the frontiers,
> Hang high the banners,
> We salute humanity.

"I cannot say that I heard any more of this sung, and when we left the second meeting for home and were being followed by this mob the policeman was between our crowd and that crowd and the officer followed us about three or four blocks."

Concerning the third and last meeting when the shooting took place Guliani testified as follows:

"I went to Bishop and Potter avenues again the next Sunday, September 9th, and before I had gone personally to the chief of police for protection and I went to the department of justice of the federal government.    On September 9th we first met at the city hall before 3 o'clock, and two detectives, Templin and Weiler, were there with us, and our party consisted of about fifteen or twenty, of whom six or seven were women.    We went to Bishop and Potter avenues in a street car and the officers went with us.    We got to that corner about five minutes after 3, and when we got to the corner we saw two other detectives there, Wesolowski and Rydlewicz, at the northwest corner, and three other men were waiting and three of these defendants, *Lilli, Denurra,* and the dead one, Tony Formaceo, who were waiting at this corner and talking.    Two of these detectives were standing on the northwest corner and two on the southeast corner.    We opened the organ and started to play the song 'Columbia' and some strangers came to our corner, stood around and listened.    They were standing close to us and appeared very friendly.    We did not complete our song because our attention was attracted to an Italian man in the crowd who told us the anarchists were not here, and then I asked him why. No. 1 and No. 8 of the defendants heard this, then asked him

which anarchists he means and he said 'who bothered you last Sunday.' Then I said, 'Where are they?' and he told me 'they are in the club over two hours and today will be trouble here.'

"A few minutes later I saw a crowd coming from the south, on the east side of the street. I do not know what there is on the corner just south on the side that they were coming up. This crowd came in military fashion, all close together, two by two, and at the head of that party was the defendant *Mary Nardini.* While we were singing 'Columbia' the crowd approached about a half a block and they stopped about a block away at the northeast corner and we were on the northwest corner, directly across the street. I cannot say that I saw all the defendants there at that time. The defendant *Denurra* was buttoning his coat, which means in Italian that he is ready to fight, and after buttoning his coat they were talking, but I didn't hear what they said. They remained for two or three minutes and when the crowd reached the corner one of them crossed the street and came to our corner, *Vincent Fratesi,* I could not understand what was said by him, and the dead one, Tony Formaceo, followed him. Then *Vincent Fratesi* went to his crowd and came back again and he spoke to two men and they followed until the middle of the street. At that time I told my congregation to sing 'America,' take off their hats, and we started to sing the national air and *Vincent Fratesi,* in the middle of the street, shook his fist towards us and said 'Coward, for such a rag.' The American flag was floating there and none other. Everybody took part with him with their hands and their fists and not one of them had removed their hats while we were singing 'America.' *Fratesi* repeated the word 'coward,' shook his fist at us and our group all the time he crossed the road until he reached the crowd, and he went back and forward about three times. I saw *Mary Nardini* with the crowd. When *Vincent Fratesi* said that, the officer, Weiler, called me; I went in the middle of the road to meet him and he asked me, 'What did the man say?' and I told him what *Vincent* said, and during our conversation *Vincent* reached the east sidewalk and the crowd remained at the same place, and Weiler went to *Vincent* and said, 'If you don't like this crowd, this meeting, please move on, they have a permit,' and Weiler searched him then, touched his

clothes, but did not put his hands in his pockets.    Then be-
hind *Fratesi* was Tony Formaceo, and I saw a revolver in his
hands opened on Weiler and then Weiler stepped down and
opened his coat to show his badge and then the shooting
started.    I cannot tell who shot, I saw the revolver, I saw
Formaceo's and the officer's.    I saw only one other revolver
than the one the officer had, the one in Formaceo's hand.
Then I went to my crowd and told them to go home because
we had women and children with us on our corner.    I started
to protect them when they started the shooting.    I noticed
on the other side of the street, where the crowd was, Forma-
ceo and the woman and the rest of them, and that there was a
battle, smoking and firing.    I don't remember of hearing or
seeing any of these defendants do anything or say anything
else after the shooting.    I saw that Tony Formaceo was in-
jured, and there was such a confusion that I didn't pay any
attention.    I saw blood running on the forehead of Templin
and I saw a handkerchief in the hand of Officer Rydle-
wicz, but I don't know why.    The other two officers went
there and held some of the persons in that crowd.    We were
singing the American hymn 'America' in the Italian trans-
lation."

Guliani testifies that he saw present at the meeting Sep-
tember 9th the following defendants: *Mary Nardini, Gavina
Denurra, Vincent Fratesi, Amedeo Lilli, Adolph Fratesi,
Pasquale Nardini,* and *Bartolo Testolin.*

Maud Richter, who played the organ at all the meetings,
and other witnesses on behalf of the state give substantially
the same testimony as to what took place at each meeting, so
far at least as such testimony bears upon the subject of a
conspiracy to commit the offense charged.    The testimony
as to what, if anything, each defendant said or did at each
meeting will be later grouped as to each defendant.

In addition to the conduct of the defendants at each of the
three meetings as outlined above there was evidence that
some or all of them rented a hall at 300 Bishop avenue, near
by, where they were in the habit of coming for the reading of
anarchistic and other literature and listening to speeches

from anarchists, socialists, and politicians.    In the hall was
found and introduced in evidence a mass of literature rang-
ing from scientific, economic, socialistic, agnostic, and free
love to anarchistic.    The great bulk of it related to anarchy
in its extreme form, and the jury were probably justified in
finding that most if not all of the defendants were anarchists
or sympathized with them.    There is, however, no evidence,
except such literature and pictures of anarchists hung on the
wall, as well as a large target showing some use with a
twenty-two caliber rifle or similar gun, to show what the
members said or did at any time at the hall.    The defendants
sought to show the substance of the speech delivered there on
September 9th just prior to the meeting of Guliani by John
La Duca, a socialist from Chicago, but the court ruled out
the evidence.    It appears that they had no regular officers of
any kind and that when any one wished to contribute money
for the rent or literature it was left on the table.

The substance of the evidence on behalf of the state show-
ing what each defendant said or did at the three meetings
and what part if any he took in the assault is as follows:

*Peter Bianchi:* Guliani testified that he could not say
that he saw him at any of the meetings.    But Officer Temp-
lin said he saw him at the third meeting, and so does Miss
Richter.    Police Officer Fischer saw and spoke to him at the
second meeting, and Miss Richter is positive she saw him
there.    Witness Piantino testified he saw *Bianchi* at the
second meeting and that he then said, "If they come down
another time we are going to give them a licking." *Bianchi*
paid the rent on the hall and so did Marinelli, who was shot,
but none of the other defendants paid any rent to the owner.
He asked Piantino several times to go to the hall when they
had anarchist speakers from Chicago. *Bianchi* claims he
paid the rent for a shoemaker who had his shop in the hall
and lived there.    He also testified that he left the crowd on
September 9th before it reached the corner of Bishop and
Potter avenues and went to his room to attend to a cut on his

finger sustained a few days before, and that he heard the shooting about ten minutes later while he was in his room.

*Gavina Denurra:* He admits he was at all three meetings. At the first meeting he shook hands with Guliani and had a talk with him. Guliani heard him say "I don't believe in God; I don't believe in priests, I don't believe in you, I don't believe in government." Guliani testified further:

"I didn't see him do anything then, and about the second meeting I don't remember, but at the third meeting I saw him on our side of the street. I saw him shaking his head and buttoning his coat and whispering and he was there before the shooting on our side of the street, and then he followed *Vincent,* and before they reached the other side the shooting started. I can't say I saw him do anything during the shooting."

There is testimony that to Italians buttoning up one's coat is a signal for a fight.

*Adolph Fratesi:* With the exception of his being identified as present by several witnesses at the three different meetings the only other testimony bearing upon his conduct is Guliani's statement:

"I saw *Adolph Fratesi* at the first meeting and can't say that I saw him do anything except listening, and I am not sure about him as to the several meetings, but I saw him at the third meeting in the crowd. I saw them shake their fists, but cannot say that he personally shook his fist, but I didn't hear him say anything."

*Vincent Fratesi:* The evidence quite satisfactorily shows he was present at all the meetings. Guliani testifies he shook his fist at him at the second meeting and said, "Before it starts to rain go home, otherwise we kill you." He was active in trying to break up the third meeting. He came out from his crowd several times into the middle of the street, and immediately before the shooting he came out with *Testolin* and *Denurra*. Templin testified he saw him armed; that he tried to draw his gun and started shooting, and saw him put a gun in his pocket but did not see him point the gun at

any one. *Vincent Fratesi* was being searched by the officers just as the shooting began.

*Amedeo Lilli:* The evidence shows he was at all the meetings, and he admits he was at the third meeting. At the second meeting he shook his fist at Guliani and said, "Before it starts to rain go home, otherwise we kill you." Officer Templin said he saw him at the third meeting shooting point-blank at him, and the witness Famorlaro says he saw *Lilli* have a revolver before they finished the attack. Templin arrested him a short distance from the meeting but found no gun on him. *Lilli* claims he had no gun with him and that it was in his trunk at his boarding place.

*Mary Nardini* was at all the meetings. At the second meeting she was excited, talked a good deal and shook her fist at Guliani and called him a pig, and said, "Before it starts to rain go home, otherwise we kill you," according to Guliani's testimony. Miss Richter said that at the second meeting *Mrs. Nardini* called them cowards and said for one to get a gun and shoot Mr. Guliani, and the witness Germanotta testified she said "take the gun and kill this beast," referring to every one. At the third meeting, as the crowd came up, *Mrs. Nardini* seemed excited and talked with the rest, but there is no evidence of what she said, or that she did anything. She had her five-year-old son with her.

*Pasquale Nardini,* the husband of *Mary Nardini,* denies he was present at the first and second meetings, but admits he was present with his wife and son at the third meeting. Guliani says he can't say he saw him do anything, and there is no testimony that he said or did anything at any of the meetings.

*Angelo Pantaleoni* admits that he was at the third meeting, but Guliani says he could not say whether he was at any of the meetings and could not say that he saw him do anything or heard him say anything. *Pantaleoni* contributed to paying the rent of the hall.

Bianchi v. State, 169 Wis. 75.

*Louis Serafini:* Miss Richter and Officer Wesolowski name him as present at the third meeting, but he says he was in Jawec's saloon with *Belucci* at the time the shooting was done, and so does Jawec. The witness Fiscile testified he saw him pass him by in the crowd after everything was over. Guliani is unable to identify *Serafini* as being present at any of the meetings.

*Bartolo Testolin* admitted he was present at the second and third meetings, but denied he was at the first meeting, though both Guliani and Miss Richter testified he was there. Guliani said he shook his fist at him at the second meeting and said, "We are ready to receive you next time you come," also that he said, "Before it starts to rain go home, otherwise we kill you," and that he approved of *Belucci* calling the President a pig by saying "Yes, yes." Guliani said he saw his fist at the third meeting; that he was excited and was in the first line of the crowd that crossed the street. In his trunk were found two letters written between September 2d and September 9th, one addressed to "Dearest Comrade" and the other to "Dear Comrade." The former contained this statement:

"Know that last Sunday we had a good time with the evangelists and *Nardini* told you all about it. Now we are preparing for Sunday (in case they will try again) and we will give them a hearty reception. If you cannot come to receive the evangelist with us, shall you come to the drama," referring to a play to be given at the hall.

The latter letter as to the meetings read:

"Know that for two Sundays the circle here is busy to disturb fifty of these dogs of evangelists who have in mind to have a church here close to us. They have come with an organ and trumpets to sing the melodies. Naturally they found a bone very hard because these poor people were obliged to run away together with a pig (police) who had a pretense to be their guardian angel. Therefore the first Sunday they were nailed by words, and the second we did not give them the chance to sing one hymn to their Lord;

now it is believed that they will not come any more. In case they will think to send us in Heaven at any cost, then we will show them the god of rebellion on their head."

No clue appears as to whom or where they were intended to be sent.

In addition to the defensive evidence already referred to, each defendant denied that he was a member of or knew of any conspiracy or concert of action to commit the crime of an assault with intent to murder or any other offense and that he took any part in the assault.

For the plaintiffs in error there was a brief by *Darrow & Sissman* of Chicago, attorneys, and *A. C. Umbreit* of Milwaukee, of counsel, and oral argument by *Mr. Clarence Darrow* and *Mr. Umbreit.*

For the defendant in error there was a brief by the *Attorney General, Winfred C. Zabel,* district attorney, and *Arthur H. Bartelt,* assistant district attorney; and the cause was argued orally by *Mr. Zabel* and *Mr. Bartelt.*

VINJE, J. It will be seen from the foregoing statement of facts that as to some of the defendants the only proof of the state as to either offense charged in the information rested solely upon an alleged conspiracy on the part of all the defendants to encompass the assault charged. It was proper to show, if it could, that the manner in which each defendant became an accessory before the fact was through a conspiracy entered into before the shooting took place at the third meeting. If such conspiracy was established, then it became a matter of secondary importance just what part each defendant took in carrying it out. If, on the other hand, the conspiracy was not established, and if there was no concert of action agreed upon or understood before the assault began at the third meeting, then it is of the utmost importance to determine just what each defendant said and did at the time of the assault, since he could be held only as an active participant therein.

In proving a conspiracy great latitude in the admission of evidence is permissible, and the limits thereof rest largely in the discretion of the trial court.   Error is alleged because the court admitted the contents of much of the literature found at the hall and at the home of the *Nardinis.* · It·was proper to show that some, if not all, of the defendants· belonged to the same club or circle or home, and the character of that club, circle, or home had a bearing upon the· question of alleged conspiracy.   But proof that the defendants were anarchists, or were even guilty of criminal anarchy, is not sufficient of itself to prove a conspiracy to murder.· The ·proof, most favorably considered in behalf of the state, goes no further than to show that the defendants or some of them were anarchists.   It is barren of the necessary indicia of the conspiracy charged.   The letters of *Testolin* show at most only an intent on the part of the writer and some others to disturb the next meeting, if one were held.   If the proof· of conspiracy failed, they were admissible in evidence only against himself.

It appears clearly enough that most of the defendants were angry at Guliani and his party.   Whether it was because he spoke about the war and the citizen's duty to the state, or whether it was because he was not a Catholic and spoke slightingly about that religion, is not clear.   Probably because of both, but perhaps chiefly for the latter reason.   It·is also clear that the defendants or some of them entertained the thought of disturbing the meeting, but the execution of that thought would be only a misdemeanor, and those joining in it could not be held for the crime charged unless the jury found that its execution would probably lead to an assault with intent to murder.   This question the court refused to submit to the jury though in various forms requested to do so.

In addition to the paucity of proof showing a conspiracy to commit the offense charged, there is considerable undisputed evidence that the assault as made was the independent and spontaneous act of a few of the defendants, precipitated

when the police began to search *Vincent Fratesi* and *Bartolo Testolin.* The testimony shows that a large number of women and children were there—some in the so-called group of defendants which the evidence showed consisted of from twenty to thirty persons. The *Nardinis* had their little boy with them and stood well in front, where the trouble might be expected. Most of the defendants were arrested soon after the shooting took place, but no weapons were found upon any of them. Out of a large number of eye-witnesses to the assault examined, there was no evidence that any one besides Formaceo, who shot first and was killed, Marinelli, who was shot and subsequently died from his wounds, *Vincent Fratesi,* and *Lilli* had weapons of any kind. It would seem probable that a group of twenty or more intending to attack a crowd of nearly a hundred with the intent to murder would arm more of their number with weapons of some kind. Moreover, it appears that as soon as the shooting commenced both crowds began immediately to scatter. This is true, so far as the evidence discloses, of all the defendants except *Vincent Fratesi* and *Lilli.* While no one of these reasons is singly of any controlling weight, they together, with the total lack of any evidence of a preconcerted plan, persuade us that the proof as to a conspiracy failed, and we so hold.

This naturally leads us to an examination of the testimony as to what part, if any, each defendant took in the assault. The substance of such testimony has been set out in the statement of facts and it is unnecessary to repeat it here. From it we conclude and determine that there is no evidence whatever that *Pasquale Nardini* and *Angelo Pantaleoni* took any part at any time in any assault whatsoever, and that as to them the judgment is reversed, with directions to discharge them from further custody.

It is quite probable that *Peter Bianchi, Daniel Belucci,* and *Louis Serafini* were not present at the assault. But be that as it may, it is quite certain that as to them and as to *Mary*

*Nardini* and *Adolph Fratesi* the evidence would not warrant the conviction of any graver charge than that of simple assault. While they have not been imprisoned under a conviction of that offense, the fact remains that they have been deprived of their liberty under much harsher conditions and for a much longer time than they could have been had such been their conviction. Therefore, looking at the substance of things rather than at technical exactness in the manner of conviction, and in furtherance of substantial justice, it is held that they have been sufficiently punished under the improper conviction for any offense of which they could have been found guilty. The judgment is therefore reversed as to them, with directions to discharge them from further custody.

As to the defendants *Gavina Denurra* and *Bartolo Testolin* we conclude the evidence is of a character which would, with the conspiracy issue out, warrant the jury, under proper instructions, to find them guilty as charged; or to find them guilty of an assault with intent to do great bodily harm; or to find them guilty of a simple assault; or to acquit them. Since, for reasons hereinafter to be stated, error intervened prejudicially affecting their conviction, the judgment as to them is reversed and the case remanded for a new trial.

There is credible evidence that the defendants *Vincent Fratesi* and *Amedeo Lilli* were armed with revolvers and that they used the same during the assault. This evidence, if believed, and we must assume the jury did believe it, warrants their conviction in spite of any lack of conspiracy, unless other prejudicial error intervened to affect the verdict based upon such evidence. For the reasons hereafter stated we conclude that as to them no prejudicial error affects the verdict, and as to them the judgment is affirmed.

We have thus briefly and early indicated the result reached to the end that our further inquiries may be directed to only such assignments of error as affect the convicted defendants or those awarded a new trial.

Exceptions are taken in defendants' brief to some remarks of counsel for the state in arguing the case to the jury; to restrictions as to the cross-examination of some of the state's witnesses, as well as the attitude of the judge throughout the trial towards defendants' counsel. These exceptions have been carefully examined, with the result that we find no prejudicial error as to any of them. They do not seem of sufficient importance to merit separate detailed treatment. The trial was necessarily a long and a slow one and was sharply contested. It would be strange, indeed, if both court and counsel did not occasionally, during the fifteen days it lasted, lapse from the desired dignity and precision of language that we all agree should characterize every judicial inquiry. On the whole we feel that the trial court deserves commendation for its impartial discharge of a difficult duty. It sometimes becomes desirable, if not necessary, to bring counsel back rather abruptly to the real issues in the case. This is said without intending to reflect upon counsel in this case or in cases generally. It is said because we realize that counsel are constantly on the firing line and have little time for mature reflection during the progress of the trial, hence it is easy to go too far at times. When that occurs it becomes the duty of the court to call a halt.

The clerk of the municipal court of Milwaukee county is *ex officio* clerk of the district court of Milwaukee county and he was authorized to issue the warrants under which the defendants were arrested. The district court act expressly so provides. Laws 1899, ch. 218, sec. 9; Milwaukee County Laws, sec. 1347. Nor was it necessary that the record show that the complainant was orally examined under oath by the magistrate issuing the warrant. A sworn complaint in writing sufficiently satisfies the calls of sec. 4776, Stats. *State ex rel. De Puy v. Evans,* 88 Wis. 255, 60 N. W. 433. So, too, an information may be filed for an offense different from that charged in the complaint. Sec. 4653, Stats.

All the defendants except *Peter Bianchi* requested a change

of venue.   The ground for such request was chiefly this:
On November 24th, and four days before the time set for the
trial of defendants, there occurred in the central police sta-
tion in Milwaukee a bomb explosion resulting in the killing
of ten or twelve persons, two of whom, Templin and Weiler,
had assisted in the arrest of the defendants.   The newspa-
pers of the city charged the explosion, if not directly to the
defendants who were in jail awaiting trial, to their friends or
nationality.   No doubt the sentiment in the community was
not the best for an impartial trial of defendants, but since the
papers of the city circulated generally throughout the state
and the explosion was so generally known everywhere at that
time and commented upon, we cannot say that the trial court
abused its discretion by refusing the change conditionally,
as it did.   The request was not renewed upon going to trial,
and it appears the jury was secured in less than a day and
only about thirty-seven jurors were examined.   The appar-
ent difficulty or ease of securing a jury can be taken into
account in passing upon the alleged abuse of discretion in re-
fusing a change of venue.   In view of the probable condi-
tions existing elsewhere than in Milwaukee and the ease with
which the jury was secured, we perceive no error in the
court's ruling.

Officer Templin was examined on the preliminary exami-
nation of defendants *Vincent Fratesi, Amedeo Lilli,* and
*Peter Bianchi.*   Officer Weiler was examined at the prelimi-
nary examination of defendants *Adolph Fratesi, Louis Sera-
fini, Daniel Belucci, Gavina Denurra, Pasquale Nardini,
Mary Nardini, Angelo Pantaleoni,* and *Bartolo Testolin.*
Templin and Weiler were killed in the bomb explosion and a
transcript of their testimony was offered in evidence by the
state.   Upon objection made by the defendants the court
ruled as to Templin's testimony taken at the preliminary ex-
amination of *Vincent Fratesi, Amedeo Lilli,* and *Peter Bi-
anchi,* "I shall receive the testimony so, far as *Vincent Fra-
tesi, Amedeo Lilli,* and *Peter Bianchi* are concerned."   When

his testimony taken upon the preliminary examination of *Peter Bianchi* was offered the court said: "It is received only as against defendant *Bianchi.*" When the testimony of Weiler was offered the court said: "It will be received for the same reason indicated." And in its charge to the jury the court told them: "You are also instructed that the testimony of Officers Weiler and Templin which was given at the preliminary examination of some of these defendants in the district court can only be considered by you as against such defendants as were present at the times of such preliminary examination or hearing." This charge, taken in connection with the court's ruling and the colloquy between court and counsel at the time the testimony was offered, advised the jury that the offered testimony could be considered by them only against the defendant at whose preliminary examination it was taken. The use of the expression "against such defendants *as were present,*" in view of the court's specific statements when the testimony was offered, must have been understood by the jury as equivalent to such defendants as were having a preliminary examination when the offered testimony was taken. . So understood the testimony was admissible. Sec. 4141*a*, Stats. 1915.

On September 12th the defendants *Peter Bianchi, Vincent Fratesi, Amedeo Lilli, Angelo Pantaleoni, Pasquale Nardini,* and *Adolph Fratesi* were taken to the office of the district attorney, were sworn and examined by him, and their testimony reduced to writing. At the trial such testimony was offered and received in evidence over the objection of the defendants, presumably on the ground that it was voluntarily given. In our criminal jurisprudence there is no room for such procedure. Voluntary confessions and statements made by a defendant may be used against him upon his trial, but that does not contemplate or include a sworn examination by the district attorney. There is no authority for such examination. While the administration of the oath was in fact but an idle ceremony, it by no means follows that the

defendants so regarded it.    It is fair to assume they were all ignorant of the illegality of the proceeding, and the district attorney failed to advise them of their constitutional right to refuse to answer any question whose truthful answer they honestly believed would tend to incriminate them.    Concede it was not strictly his duty to do so, yet he is in so far a *quasi*-judicial officer as to see to it that if a conviction is had it is in accordance with law.    But this statement must not be taken as a criticism upon the official conduct of the district attorney in this case.    We are satisfied he acted in the utmost good faith and in the sincere belief that the law sanctioned the procedure.    The trial court was of the same opinion.    That they should both err in this is not strange in view of the fact that neither this court, nor any other court, so far as we are advised, has ever before passed upon a like question.

To the defendants the examination no doubt assumed the form and sanctity of a judicial proceeding.    The oath administered required them to tell the truth.    It will not lie in the mouth of even a prosecuting officer, much less of a court, to say that an oath carries with it no sanction.    While good ethics and morals require the truth to be told upon all occasions, the necessity for so doing is in law regarded as accentuated by the administration of the oath.    The sworn witness is under a species of extra-moral duress to tell the truth. When that fact is coupled with the fact of the illegality of the proceeding, it will be readily perceived that the testimony given by them falls neither under the head of what is ordinarily understood to be a voluntary statement or confession, nor under that of testimony taken in a lawful judicial inquiry.    In a criminal case a defendant cannot be compelled to testify.    When he does it is his voluntary act, and his statements so made are regarded to be voluntary and therefore admissible in evidence against him.    Here the testimony given was not voluntary.    This court recognizes the doctrine that a statement may be voluntary though not vol-

unteered *(Tarasinski v. State,* 146 Wis. 508, 131 N. W. 889), but that is quite different from a statement obtained under the *quasi* duress of an oath. For the reasons assigned the statements were erroneously admitted in evidence.

It is idle to discuss whether they worked prejudice as to those of the defendants that are discharged. But since *Vincent Fratesi* and *Amedeo Lilli* are held under the conviction, it becomes necessary to determine whether their statements erroneously received in evidence materially affected the verdict as to them. We deem it unnecessary to give even a synopsis of their statements. It is sufficient to say that they relate almost wholly to their connection with the hall or circle at 300 Bishop avenue and with their belief or disbelief in anarchy. They both contain disclaimers of any knowledge of or connection with any conspiracy whatever, and denials of the fact that they took any part in the assault at the third meeting. It is therefore evident that their statements bear upon the subject of a conspiracy and not upon the assault. At least no damaging fact as to the assault is contained in either statement.

As before indicated, the evidence against these two defendants as active participants in the deadly assault is quite clear and satisfactory and supports the verdict. That being so, it becomes quite immaterial whether or not they were anarchists and whether or not they joined a conspiracy as charged. The result we reach is that as to these two defendants the verdict would probably not have been different had their statements been excluded. Hence their admission was not prejudicial error as to them.

The only explanation that can be given to the fact that all the defendants were convicted of the crime charged in the first count of the information and that all received the same sentence of twenty-five years in the state prison is that the jury found a conspiracy to commit such offense existed before they came to the third meeting and that the trial judge took the same view or he would not have made their sentence

Bianchi v. State, 169 Wis. 75.

the same.    With the conspiracy feature out there was nothing, as we have seen, to convict some of the defendants of any offense, and only a simple assault shown as against others.    The instructions, therefore, relating to a conspiracy to commit a felony and those relating to criminal anarchy as defined by secs. 4522a and 4522b of our statutes should not have been given.    In view of the direct testimony showing active and deadly participation in the assault by *Vincent Fratesi* and *Amedeo Lilli*, we conclude that the instructions referred to did not prejudicially affect them.    But we do think, in view of the meager and uncertain evidence connecting *Gavina Denurra* and *Bartolo Testolin* with the crime of which they were found guilty, that the giving of such instructions and permitting the jury to find a conspiracy was prejudicial to them.    We are inclined to the view that had the conspiracy feature been eliminated as it should have been at the close of the state's case, and had proper instructions relative to what is necessary to become a participant in an assault, in the absence of a conspiracy, been given, the verdict as to them might have been different.

*By the Court.*—As to the defendants *Vincent Fratesi* and *Amedeo Lilli* the judgment is affirmed.    As to the defendants *Gavina Denurra* and *Bartolo Testolin* the judgment is reversed, and the cause remanded for a new trial.    The warden of the state prison will deliver them into the custody of the sheriff of Milwaukee county, who will hold them in custody until further order of the court.    As to the defendants *Pasquale Nardini, Angelo Pantaleoni, Peter Bianchi, Daniel Belucci, Louis Serafini, Adolph Fratesi,* and *Mary Nardini* the judgment is reversed, and the cause is remanded with directions to discharge them from further custody.    The warden of the state prison will deliver them into the custody of the sheriff of Milwaukee county, who will hold them in custody until discharged pursuant to this direction.

KERWIN and ROSENBERRY, JJ., took no part.