Krueger v. State, 171 Wis. 566.

<hr>

KRUEGER and another, Plaintiffs in error, vs. THE STATE, Defendant in error.

*April 12—June 1, 1920.*

*Homicide: United States marshal serving warrants for draft evaders: Evidence sufficient to sustain conviction of murder: Submission of lesser degrees to jury: Officer killing person resisting arrest: Killing of member of posse: Criminal law: Change of venue: Discretion of court: Accessory before the fact: Aiders and abettors: Harmless error: Evidence: Indictment and information.*

1. In a prosecution of draft evaders for murder committed while resisting arrest, the circumstantial evidence is *held* sufficient to warrant a verdict of guilty as against one of them, although there was no direct evidence that he personally did any shooting or aided and abetted therein.

2. The disposition of a motion for change of venue on account of the prejudice of the people of the county necessarily rests largely in the discretion of the trial court, and its action is not to be reversed in the absence of abuse.

3. The admission in evidence of shoes worn by a witness who was shot a number of times during the affray, which shoes had bullet holes in them, is *held* not error as tending to prejudice the jury, in view of the testimony of the witness and a statement of the court in receiving the evidence that it was admitted only to show the direction from which the shots came.

4. Failure of the trial court to submit the question of whether or not defendants were guilty of murder in the second degree or manslaughter in the third degree, is *held* proper in view of a showing that the shooting was deliberate.

5. One who is charged simply as principal cannot be convicted as an accessory before the fact; but an erroneous instruction as to the guilt of an accessory before the fact is not prejudicial in the absence of evidence tending to show that either defendant was an accessory.

6. An accessory before the fact is one whose will contributes to a felony committed by another as principal while he himself is too far away to aid in the felonious act: one who was not present, actually or constructively, at the time a felony was committed, but who counseled, procured, or commanded another to commit it.

7. Those present assisting one who personally commits a felony are aiders and abettors and are guilty as principals.

8. Where a deputy United States marshal held warrants for the arrest of draft evaders, though their offense was only a misdemeanor under the federal statutes, when they resisted arrest with force of arms to the point of taking life the marshal had a right to overcome such resistance, and any taking of life necessary to do so constituted justifiable homicide under sec. 4366, Stats.

9. Where the deputy marshal, while attempting to serve such warrants, called for assistance by messengers to a village, one who responded, though not specifically called to the assistance of the marshal in person, had the status of an officer, and the killing of him by the draft evaders was murder.

ERROR to review a judgment of the circuit court for Clark county: JAMES O'NEILL, Circuit Judge. *Affirmed.*

Caroline, *Frank,* and *Leslie Krueger,* hereinafter referred to as the defendants, were informed against and tried for the crime of murder of Harry Jensen in the circuit court for Clark county. Caroline was acquitted, *Frank* and *Leslie Krueger* were found guilty of murder in the first degree and sentenced to life imprisonment. To review the judgment of conviction the defendants *Frank* and *Leslie Krueger* bring this appeal.

For the plaintiffs in error there was a brief by *Kaftan & Reynolds* of Green Bay, and oral argument by *John Reynolds.*

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *Frank Jackson,* district attorney of Clark county; and the cause was argued orally by *Mr. Messerschmidt* and *Mr. Jackson.*

OWEN, J.    The Krueger family, consisting of Caroline Krueger, the widowed mother, and her sons *Frank,* Ennis, Louis, and *Leslie,* lived on a farm in Clark county, Wisconsin, about two and one-half miles from the village of Owen.    The two sons *Leslie* and Louis were within the draft age and duly registered as required by the United States statutes.    Louis Krueger was ordered to Neillsville for physical examination on February 2, 1918, but failed to appear, and up to September 14, 1918, had not appeared in response to the order.    *Leslie* took his physical examination as required, and on the 5th day of June, 1918, was cited to be at Neillsville on the 24th day of June to entrain for military service.    He never appeared.    Under the compulsory military service laws of the United States it became the duty of *Frank* and Ennis to register on the 12th day of September, 1918.    They failed to register.

In due course warrants were issued for the arrest of *Frank* and Ennis Krueger charging them with failing to register, and placed in the hands of Joseph Gans, deputy United States marshal, for service.    On the 14th day of September, 1918, he and C. E. Marks, a special agent of the bureau of investigation of the department of justice of the federal government, went to the village of Owen and, in company with Peter Rasmusson, village marshal, proceeded to the Krueger farm in an automobile driven by one Kidd, for the purpose of serving said warrants.    They went to the house and inquired of Mrs. Krueger where the boys were and were told that they were in the cornfield.    They proceeded back along the highway, a distance of sixty or eighty rods, and observed *Frank* and Ennis working in the corn-

field a short distance from the highway.   They stopped the automobile and Gans, Marks, and Rasmusson got out and went to the fence.   Gans called to *Frank Krueger,* who was about one hundred feet from the fence, and said: "Come here.   I want to speak to you."   *Frank* said: "If you want to speak to me, speak from right where you are."   Gans said: "I am the United States marshal and have a warrant for you; come over here, I want to talk with you."   Ennis Krueger then opened fire on the officers, and an exchange of numerous shots between the Kruegers and the officers followed.   The Kruegers fired seven or eight shots at the officers, one of which cut the coat of Marks on his shoulder. The Kruegers retreated in a zigzag course toward the Krueger house, keeping up the fusilade as they retired. Gans then told Kidd and Rasmusson to go to the village of Owen to get more ammunition and help.   Gans and Marks went to the house of one Vater, just across the road from where the shooting occurred, and while they were standing in Vater's yard talking to him bullets whistled in their close proximity and they saw two men standing in the highway in front of the Krueger house shooting at them with rifles. At least five or six shots were fired at that time.   Marks and Gans then went to Withee, called up the United States marshal's office at Eau Claire, informed him of what had happened, and the marshal instructed them to get help and serve the warrants.   Shortly, Rasmusson returned from Owen with four or five men, and sent them east across the field north of the house, the idea being for them to reach the woods east of the field and make their way down to the saw-mill east of the Krueger residence to prevent the Kruegers' escape in that direction.   While going across the field these men were fired upon from the Krueger barn.   Of this party, one White was hit twice, and another, Emil Laneo, was hit nine times.   The bullets came from the direction of the Krueger barn.   Reinforcements that Gans had secured at Withee then began to arrive on the scene, as well as further

volunteers from Owen.   These men gathered in the high-way south of the Vater house and from forty to sixty rods north of the Krueger house.   They were fired upon from the Krueger premises, and the deceased, Harry Jensen, was there killed, and another man by the name of Page was hit. The posse opened fire on the Krueger premises, and upwards of 150 bullets penetrated the Krueger residence.   Mrs. Krueger finally surrendered and later *Frank,* seriously wounded, also surrendered.   *Leslie* and Ennis made their escape from the premises that night, but *Leslie* was later arrested upon the charge of murder of said Harry Jensen. Upon the trial Caroline Krueger was acquitted and *Frank* and *Leslie* were convicted of murder in the first degree.

In behalf of *Leslie* it is contended that there is no evidence warranting his conviction.   There is plenty of evidence that he was around the barn or house from which the shooting on the part of the Kruegers took place.   There is no direct evi-dence that he personally did any shooting or that he aided and abetted therein.   The evidence in this respect is circum-stantial, but in our judgment entirely sufficient to warrant the verdict of the jury.

It is plain that the entire family resented the draft and had no disposition to comply with the compulsory military service act.   While Louis and *Leslie* registered, Louis failed to report for physical examination and *Leslie* failed to re-port for entraining.   To all intents and purposes, there-fore, they were deserters from the army and fugitives from justice.   *Leslie* hung around the Krueger premises after his failure to report for entraining, and, in the language of *Frank,* "stayed in the barn daytimes and bummed around nights."

Harry Hewett, a witness for the state, testified:

"I talked to *Leslie Krueger* in the latter part of October or the first part of November, 1918.   *Leslie Krueger* told me he was there on the 14th of September.   He said he was up in the barn when the automobile first came there.   He

said he saw the shooting in the cornfield, and he said that the United States marshals did the first shooting and said he was absolutely sure they did.   He did not say that he stayed on the place all day, but he told me about the time he left, just a short time after nightfall after dark set in.   He said that he left the place at nightfall, just shortly after his brother *Frank* was taken out of the place by Vater.   He said that Ennis and him left together and that he had his revolver in his hands.   He said that the fellow he met didn't pay any attention to him and it was a good thing for him he didn't, for if he had he would have been a dead one."

This evidence was not denied.   This, plainly reveals *Leslie's* attitude.   He was hostile to the idea of compulsory military service and evidently was resolved not to submit thereto.   He left the place at nightfall with his revolver in his hands.   "The fellow he met didn't pay any attention to him and it was a good thing for him he didn't, for if he had he would have been a dead one."   With this revelation of his character and disposition it is not difficult to believe that he joined with his brothers in fighting off the United States marshals, and but slight evidence of his participation is required to justify a verdict of guilty.

While the evidence is clear that the marshal's posse was met with a fusilade from the Krueger premises, it is said that there is no evidence to connect *Leslie* therewith.   Let us see.   *Frank Krueger* gives a detailed statement of his movements from the time he left the cornfield until he surrendered, and at no time does he locate himself in the barn. He says that he was either in the house or outside of the house, near the windmill and a threshing separator.   Numerous witnesses for the state testified that during the affray they saw one man a considerable portion of the time in the yard, around and about the house.   It may be assumed, therefore, not only from the testimony of the state's witnesses, but by the admissions of *Frank,* that he was not in the barn.   If, therefore, two men were shooting from the barn, the testimony of *Frank* shows that he was not one of

them.    The only other men on the premises were *Leslie* and *Ennis*, and if two men were shooting from the barn *Leslie* must have been one of them.

Frank Giffin was one of the party ,who crossed the field going from the highway to the woods on the east side of the field.    He testified as follows:

"*Q.* Did you see any persons around the Krueger buildings?    *A.* Not until after we had seen them shoot out of the barn door, the north door towards Vater's.

"*Q.* Who did you see in the barn door?    *A.* I can't tell. I didn't see them myself.    I seen the smoke from the guns, but I couldn't see the men.

"*Q.* When did you do the shooting?    *A.* After we see them shooting out of the north door of the barn towards Vater's.

"*Q.* How did these shots sound that came from the Krueger premises?    *A.* I heard two shots, two bullets, very distinctly, and one of them made a sharp s-s-s-s and the next one sounded z-z-z-z.

"*Q.* Could you tell by the sound whether there was more than one rifle being used or not?    *A.* It sounded like a low-power gun and a high-power gun.    That is what it sounded like."

This justifies the conclusion that two men were shooting from the barn and, if there were two, *Leslie* must have been one of them.    Now if, in addition to this testimony, we can find that there were three rifles on the premises, the conclusion is strengthened.

C. J. Good, a witness for the state, testified that he had a talk with *Frank Krueger* at the hospital at Chippewa Falls on the 21st day of September, 1918.    He further testified as follows:

"I asked him about what guns they had up there and he said they all had guns.    I think he said that he and *Leslie* had 35 automatics.    Ennis had a high-power gun, a 45 Colt's automatic, and Louis had a 32 automatic."

*Frank Krueger,* in his testimony, partially denied having this conversation with Mr. Good, in the following equivocal

and evasive manner, as appears from these questions and answers in his testimony:

"*Q.* And *Leslie* had a rifle, didn't he? *A.* No, he didn't.

"*Q.* Well, how many rifles did you have on the premises? *A.* Two.

"*Q.* Didn't you tell Mr. Good that you had a rifle and Ennis had a rifle and *Leslie* had a rifle? *A.* I don't remember.

"*Q.* Well, if you did tell him that, was that the fact? *A.* It was a fact that Ennis and I had a rifle, yes.

"*Q.* Well, *Leslie* had a rifle also, didn't he? *A.* I don't know.

"*Q.* Were there not three rifles around your place? *A.* Yes, there was an old one in the basement, but it was no good.

"*Q.* But didn't you have three high-power rifles on your premises last summer? *A.* We only had two that I know of.

"*Q.* Didn't you tell Mr. Good that you had three? *A.* I don't remember what I told Mr. Good.

"*Q.* Didn't you tell Mr. Good that you had a 35 Remington automatic? *A.* I don't remember very closely what I told Mr. Good because I was in pain at that time.

"*Q.* Well, did you have a 35 Remington automatic? *A.* I did.

"*Q.* Did you tell Mr. Good that *Leslie* had a 35 Remington automatic? *A.* I don't know as I did. I told you I didn't remember. I was in pain the first evening.

"*Q.* Isn't it a fact that *Leslie* did have a 35 Remington automatic? *A.* I don't remember.

"*Q.* Do you know whether or not *Leslie* ever had a 35 Remington rifle? *A.* Do I remember whether he had one?

"*Q.* Yes, did he own one? *A.* He has had one in his hands, yes, he used mine.

"*Q.* Well, but did you own one and did he own one? You know what I mean. *A.* I don't remember. No, he didn't."

This testimony of *Frank Krueger* that *Leslie* did not own a rifle is far from satisfactory and is not of that straightforward and positive character that carries conviction.

Taken in connection with the testimony of Mr. Good it was not at all unreasonable for the jury to disbelieve *Frank's* testimony with reference to the number of rifles present on the premises.

We have then these brothers, all of whom were attempting to evade the draft; all of whom had refused to comply with the requirements of the federal statutes in that respect; *Leslie* had been a fugitive for more than two months, remaining at the Krueger home, but hiding in the barn during the daytime; the family was well equipped with firearms and, as the testimony shows, had laid in a good supply of ammunition during the summer. The conclusion is almost irresistible that *Leslie* was in entire sympathy with the resistance made by Ennis and *Frank* to the United States marshals when they came there to cause their arrest. That he had no compunction about killing is revealed by the admission he made to Hewett, which is undenied. That the affray could take place there that afternoon and *Leslie* remain passive, neither aiding nor abetting his brothers in their resistance, seems highly improbable. In addition there was evidence from which the jury could very reasonably conclude that there were sufficient rifles to arm all three, and that *Leslie* and Ennis did the shooting at the crowd from the barn. We feel that the verdict finding *Leslie* guilty is not only sufficiently, but very satisfactorily, sustained by the evidence, and that his conviction should not be disturbed upon the ground that it is not so supported.

We come now to the consideration of various alleged errors occurring during the trial. The first in order discussed in defendants' brief is that the court erred in not granting their motion for a change of venue from Clark county on account of the prejudice of the people. There were twenty-three affidavits made and filed with the court in support of the motion. Thirteen of these affidavits were stereotyped and set out in considerable detail the reasons justifying the conclusions of affiant that the defendants

could not have a fair trial in Clark county.   The other ten were individual affidavits which, with one or two excep-tions, were of a much more conservative nature.   In oppo-sition to the motion the state filed upwards of fifty affidavits, made by citizens of Clark county, principally stereotyped, to the effect that in the belief of affiant defendants could have a fair trial in Clark county and that the citizens of adjoin-ing counties were apt to have as much knowledge or in-formation concerning the affair as did the citizens of Clark county, for the reason that the details thereof were widely and extensively published in papers having a general state circulation, and that the people of the state generally had the same information as to what occurred at the Krueger farm as do ninety-five per cent. of the people of Clark county.   Manifestly, if the motion were to be decided in accordance with the preponderance of the number of affi-davits, it was correctly decided, and in *Perrin v. State,* 81 Wis. 135, 50 N. W. 516, it was said, "no error can be pred-icated on the refusal to change the venue, as there seems to have been substantially as strong a showing on the part of the state as on the part of the defendant."   However, we desire to emphasize the fact that the disposition of a motion for a change of venue on account of the prejudice of the people necessarily rests very largely in the discretion of the trial court and its action thereon is not to be reversed in the absence of an abuse of such discretion.   *State ex rel. Car-penter v. Backus,* 165 Wis. 179, 161 N. W. 759.

The difficulty of impressing upon the record a true con-cept of the public sentiment in the county is manifest.   Just as the trial judge is in a better position to weigh the testi-mony of witnesses who appear before him, so is he in a better position to judge of the public sentiment of the county.   He is on the ground and in a position to sense, in a way that this court cannot, the true sentiment of the com-munity and to judge much more correctly whether it is such as to prevent a fair trial on the part of the defendants.

This is especially true in the instant case, where the trial judge was a resident of Clark county and had an opportunity of acquiring an instinctive knowledge of the situation which cannot be preserved in the record, for which reason his opinion should be accorded great weight. In the instant case the prophecies of those who deposed that the defendants could not have a fair trial in Clark county were somewhat discredited by the fact that Caroline Krueger was acquitted and that several peremptory challenges on the part of the defendants were not used in securing the jury. In *Bianchi v. State,* 169 Wis. 75, 171 N. W. 639, it was said that "the apparent difficulty or ease of securing a jury may be taken into account in passing upon an alleged abuse of discretion in refusing a change of venue." We do not mean to infer that a fair trial consists in an impartial jury alone. It may be possible to secure a jury who never heard of the case in a county where the sentiment crystallized in the court room is so tense and public feeling runs so high that knowledge thereof cannot be kept from the jury. Under such circumstances the impossibility of a fair trial may exist even though an impartial jury be secured. A fair trial includes, as well as an impartial jury, a trial in an atmosphere and under conditions assuring a verdict upon the evidence and not upon a public sentiment from the influence of which the jury cannot be kept entirely free. In view of the broad discretion reposed in trial courts in this respect we are prompted to say that it is not a discretion to be either grudgingly or too liberally exercised. The statute authorizing the change in the place of trial was passed in furtherance of the constitutional provision (sec. 7, art. I) providing safeguards for accused persons. The law should be administered with wisdom and consideration commensurate with the responsibility reposed in trial courts, to the end that the spirit prompting the enactment may be effectually carried out. What has been said abundantly forecasts our conclusion that in the instant case we find no abuse

of discretion on the part of the trial court in denying the motion.

Defendants next complain because the shoe of the witness Laneo, who was shot nine times in going from the highway to the woods on the east of the field, was introduced in evidence and exhibited to the jury. The witness was permitted to testify without objection to his adventures in crossing the field, to the fact that he received nine bullet wounds and the location of such wounds upon his body. He testified that the bullets that struck him came from the direction of the Krueger farm. He described the position in which he was lying at the time—his feet toward the Krueger barn. His shoes were produced showing bullet holes in them, admitted in evidence and exhibited to the jury. The admission of the shoes in evidence was strenuously objected to by the defendants because, it was asserted, their exhibition tended to prejudice the jury, in response to which the court stated:

"The court understands counsel is offering this evidence for the purpose of showing the direction from which the shots came. The court is receiving this evidence for that purpose, if it does tend to prove it, and the jury will receive it for that purpose. The objection is overruled."

In the first place we cannot see how the exhibition of the shoes could tend to prejudice the jury. The witness was testifying freely to his wounds received by reason of bullets coming from the Krueger barn, and the exhibition of the shoes could add nothing to his testimony to the effect that he received such wounds. The shoes did furnish ocular proof of the course of the bullets which penetrated his feet and, assuming his testimony with reference to the position in which he was lying to be correct, tended to corroborate the statement that the bullets came from the Krueger premises. We see no error in the admission of the shoes in evidence.

The next contention is that the court erred in not submitting to the jury the question of whether or not the de-

fendants were guilty of murder in the second degree or of manslaughter in the third degree. We shall spend very little time upon this assignment of error. Taking the evidence as a whole, there is no room for the conclusion that the defendants fired into the crowd with no premeditated design to kill, or that it evinced at the most a depraved mind regardless of human life constituting second-degree murder, or that the shooting was done in the heat of passion without a design to effect death, constituting manslaughter in the third degree. There was ample time for the defendants to meditate, and that they deliberately shot to kill is the only reasonable conclusion to be drawn from all the evidence. They were conscious of guilt. They knew that they had failed to register in compliance with the federal statutes; that they anticipated arrest or an attempted arrest is a natural inference. They bore arms while engaged in the peaceful occupation of husbandry, and opened fire on the officers while a fence yet separated them and before any overt act on the part of the officers to bring them into subjection. They fired at the officers while they stood in Vater's yard. They fired upon and wounded the men who crossed the field to the woods upon the east. They fired upon the posse when Jensen was killed. In all this the evidence overwhelmingly shows they were the aggressors. They were in no danger of the least physical injury if they but did what the law required of them, namely, submit to arrest. This they could have done at any time in perfect safety. But their conduct was in resistance of arrest, in defiance of the law, and manifested from start to finish a clear purpose on their part to shoot to kill after ample opportunity for meditation and deliberation. Even if we should accept the testimony of *Frank* and all the testimony given in behalf of the defendants, there would be no room for the contention that the evidence would sustain a verdict for murder in the second degree or manslaughter in the third degree.

In its charge the court used the following or similar language a number of times:

"In such case if the other defendants aided in the commission of such offense, *or was accessory thereto before the fact by counseling, aiding, or otherwise procuring the same to be committed,* then in such case such other defendants are equally guilty with the principal felon and are to be punished in the same manner."

As none of the defendants were charged in the information as accessories before the fact, it is contended that this and similar language used in the charge constituted prejudicial error. That it was not a correct statement of the law is established by *Karakutza v. State,* 163 Wis. 293, 156 N. W. 965, where it is held that one who is charged simply as principal cannot be convicted as an accessory before the fact, as the two offenses are separate and distinct crimes. We do not think the error was prejudicial, however, because there was no evidence in the case tending to show that either of the defendants was an accessory before the fact. An accessory before the fact is one whose will contributes to a felony committed by another as principal while himself too far away to aid in the felonious act. Bishop, New Crim. Law, § 673. An accessory before the fact is one who was not present actually or constructively at the time when a felony was committed, but who counseled, procured, or commanded another to commit it. It is essential that the person charged as an accessory before the fact should have been absent at the time of the commission of the crime, otherwise he is a principal in the second degree and not an accessory. 16 Corp. Jur. 134. Those present assisting one who personally commits the offense are aiders and abettors and are guilty as principals. *Vogel v. State,* 138 Wis. 315, 332, 119 N. W. 190. There is no contention that this crime was committed in the absence of either *Frank* or *Leslie.* Hence they could not be accessories before the fact. Both being present, if they aided, counseled, or pro-

cured the commission of the crime they were aiders and abettors and could be convicted as principals. In *Vogel v. State, supra,* it was said of a similar charge:

"There was no evidence tending to show that any person was guilty as an accessory before the fact, as defined above, and no testimony to which this part of the instruction could apply, if it were intended to reach absentees who counseled the commission of the offense."

In the instant case the court made no attempt to define an accessory before the fact, and, as there was no evidence that any one to whom it could apply was absent, the jury must have understood the language "counseling, aiding, or otherwise procuring the same to be committed" as applying to those who were present, in which case they were aiders and abettors and could be convicted as principals, and they could not have been misled by the language used.

The court instructed the jury to the effect that the warrants in the hands of the deputy United States marshal were valid warrants and vested the deputy marshal with full and complete power to arrest the persons named therein·and to use such force as was reasonably necessary to secure and detain them and overcome their resistance and protect the marshal or deputy from bodily harm; referred to the legal duty of the deputy marshal to serve the warrants, and that by sec. 788 of the United States Revised Statutes the marshals and their deputies shall have in each state the same powers in executing the laws of the United States as their sheriffs and their deputies in such state may have by law in executing the laws thereof; that by the laws of this state sheriffs and their deputies, in the apprehending or securing of any person for felony or breach of the peace, may call on such persons or invoke the power of their county as they may deem necessary, and said that "this expression, 'power of their county,' means the same thing as posse or citizens of the county summoned to aid in the execution of process;" referred to sec. 4366 of the statutes of the state, where it is

Krueger v. State, 171· Wis. 566.

provided that homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance in overcoming actual resistance to the execution of some legal process, and told the jury that "if the persons named in the warrants resisted arrest and resorted to the use of firearms against the marshal, he had the right to use firearms against them also and to shoot and even kill them if that became necessary to capture them and execute the writ and mandate in the marshal's hands;" referred to sec. 4489 of the Wisconsin Statutes, providing a penalty for resisting a sheriff or deputy sheriff while engaged in the lawful execution of any criminal process, and said:

"The officer having made known his official position and that he had a warrant for the arrest of the accused, the citizen's duty is to quietly submit and appear before the magistrate or court and there make his defense. He ought not to take the law into his own hands and unlawfully resist."

The court refused to charge the jury, as requested, that the crime upon which the warrants in the hands of the deputy marshal were issued, to wit, the failure to register, was a misdemeanor, and that "except in self-defense an officer has no right to proceed to the extremity of shooting people in resisting or preventing the escape of one whom he has arrested for an offense less than a felony, even though the offender cannot be taken otherwise." The court also refused to instruct the jury as follows: "That no person who has not been duly summoned to aid an officer has a right to participate in an attempted arrest." It is claimed that the court erred in charging the jury as above indicated and in refusing to charge as thus requested.

This brings up the general subject of the power and duty of an officer situated as was the deputy United States marshal, and those called to his assistance, which we will briefly discuss. It is claimed, in the first place, that because the offense committed by *Frank* and Ennis, upon which the war-

rants were issued, is by the federal statutes made a misdemeanor, the officers and those called to their assistance had no authority to go to the extremity of killing in order to apprehend the persons named therein, and the case of *Goscsinski v. Carlson,* 157 Wis. 551, 147 N. W. 1018, is cited to our attention. That case is authority for the proposition that an officer may not take the life of one whom he is attempting to arrest upon a warrant charging him with a mere misdemeanor. That principle, however, has no application here. While in order to apprehend the person charged with a misdemeanor only an officer may not take the life of the person so charged, it does not follow by any means that any resistance offered to the arrest may not be overcome to the extent of taking life, if that be necessary to overcome the resistance. In this case it was the duty of the deputy United States marshal to serve these warrants. While he would not have been justified in shooting in order to prevent their escape had they taken flight, he was by no means compelled to abandon his efforts because they commenced firing upon him. It was not only his privilege but his duty to overcome such resistance, and the taking of life necessary to do so constitutes justifiable homicide under sec. 4366, Stats.

But it is argued that the deceased was not thus protected because he had not been specifically called to the assistance of the deputy marshal. One very effectual answer to this proposition is that, whether or not he was acting under the command and in assistance of the deputy marshal, the Kruegers had no right whatever to shoot him. He was in the public highway, where he had a right to be. He had not shot at the Krueger premises and there is no pretense that he was killed in self-defense. But the contention that he was not acting in the assistance of the deputy marshal cannot be sustained. There is no requirement of the law that in order to enjoy the immunity and protection accorded to

an officer under such circumstances a citizen must be formally and specifically called to the assistance of the officer, or that he be specially commissioned or sworn in in that capacity. In the very nature of things a call for assistance on the part of the sheriff or other officer cannot always be addressed with discrimination and to specific individuals. The call generally comes when the sheriff is hard-pressed. It may be in the nature of a cry of despair or a bugle call to arms, calling upon all who may hear it, or be advised of it, to rally to the assistance of the officer endeavoring to serve legal process and thus to maintain the majesty of the law. Under such circumstances there is a duty resting on all citizens who know of the call to go to the relief of the officer, even though failure to perform the same does not constitute an offense under sec. 4488, Stats. It is a moral duty incident to citizenship, even though under the circumstances a conviction for failure to perform the same could not be had under sec. 4488. In this case Rasmusson was sent to Owen for help. Gans and Marks went to Withee to secure help. They called upon persons indiscriminately, who in turn passed the call along to others, to rally at the Krueger farm, and in response to this a posse of considerable proportion there assembled. We hold that all who were there, constituting the posse, lending assistance to the deputy United States marshal in the apprehension of those for whom he held warrants, were acting under his direction and command, constructively at least, and were entitled to the same protection and immunity extended to the deputy marshal himself. From this it follows that there was no error on the part of the court in charging as above indicated or in refusing to give the instructions requested as above specified.

Exceptions are also taken to numerous remarks of counsel for the state in their addresses to the jury. No useful purpose will be subserved by a detailed statement of such re-

marks and by an extended treatment of these assignments of error. We have given them our careful attention and reached the conclusion that they do not constitute prejudicial error.

*By the Court.*—Judgment affirmed.