LANG, Plaintiff in error, vs. THE STATE, Defendant in error.

*June 12—July 8, 1922.*

*Criminal law: Murder: Confessions: Admissibility of evidence: Weight accorded decision of trial court: "Third degree" and "sweating" process: Subsequent confessions: Instructions: Truth or falsity.*

1. In a prosecution for murder, the evidence (set out in the opinion) is *held* sufficient to show that a confession was made under duress through the employment of the "third degree" inquisition and the "sweating" process under circumstances which amounted to torture.
2. A free and voluntary confession is deserving of the highest credit, but a confession forced from one who makes it by hope of reward or fear of torture is not admissible in evidence.
3. The decision of a trial court to admit evidence as to a confession should control on appeal unless the decision was clearly against the evidence.
4. Where a confession was secured by coercion, and on subsequent occasions shortly afterward the accused made other statements while in the presence of police officers admitting commission of the crime, but afterward, when out of their presence, denied its commission, the admission of evidence of the subsequent confessions was improper, as the interval of time between the first and the succeeding confessions was brief and the controlling influence which led to the first confession had not been removed.
5. An instruction that if a confession admitted in evidence had been secured by force and under influence of fear of physical punishment by those having the accused in custody the jury might, if it believed the confession false and unworthy of credit, reject the confession, was error in that it failed to require the jury to reject the confession if involuntary and because it made the falsity of the confession a condition of rejecting it.

ERROR to review a judgment of the circuit court for Kenosha county: E. B. BELDEN, Circuit Judge. *Reversed.*

Plaintiff in error, hereinafter called defendant, was convicted of murder in the second degree and sentenced to

twenty years in the state penitentiary at Waupun. His conviction rested upon alleged confessions made while in the custody of the police, which he repudiated before trial.

Charles Pacini, the murdered man, conducted the Majestic theater on Main street in the city of Kenosha. Shortly after 11 o'clock on the night of August 14, 1920, he left the theater and drove to a garage on Park street, about two blocks distant, where he customarily kept his car.

About 11:15 Sam Russo, who lived on Exchange street in the immediate vicinity of the garage, heard a scream followed by a shot and then three shots in succession. He ran towards the garage, and when he approached the corner he saw Pacini running towards Main street, holding his side and crying "I am shot."

Paul Miller was walking along Main street at the corner of Park. He heard the shooting, ran towards the garage, met Pacini, and walked with him to his theater. Arriving there Pacini asked Miller to go back to the garage and find his keys. Miller found the keys in the door and also found near by an open pocket-knife.

Before he returned Pacini had been found sitting on the steps of the theater by Charles Rock, a policeman, who called an ambulance. As he was being 'helped into the ambulance Pacini was heard to remark that "he knew who shot him and he would get him." He died the next day without having disclosed the identity of his assailant.

Pacini carried a 38-caliber Colt automatic pistol. Three shells had been exploded. There were found in the garage three empty shells corresponding to those used by Pacini.

On the night of September 27th Frank Lang was taken into custody at his home as a suspect in connection with the robbery of the Cozy saloon on the preceding night. After extended questioning he confessed to this robbery and also to the robbery of thirty-six other places of business, one of which was a jewelry store. About 4:30 in the morning he

signed a statement to the effect that he had shot Pacini in an attempt to rob him.

On the following day he was taken to Chicago. He pointed out one of the proprietors of a pawnshop as the man to whom he had sold jewelry secured in one of the robberies. In another pawnshop it was found that about two years before he had bought a revolver. This revolver had been taken from him by the police during the preceding year.

The following morning he was taken to municipal court, where he waived preliminary examination. He was then taken to the circuit court, when, just as a plea of guilty was being entered, an attorney appeared at the request of defendant's wife. A conference was held with the court and district attorney; defendant denied his guilt; the plea of guilty was set aside and a plea of not guilty entered.

At the trial the state offered in evidence the following alleged confession:

"I, *Frank Lang,* being first duly sworn on oath, depose and say that I live at 175 English Court, in the city of Kenosha, Wisconsin, and am forty-five years of age. That on the 14th day of August, 1920, at said city of Kenosha, Wisconsin, I shot Charles Pacini. I went to hold up Charley Pacini and then I shot him and ran home. I had the gun at Pacini's show on that night and waited until the show was closed up and then I sat on the curb of Exchange and Park streets waiting for him; and then when he was coming out of the door I told him to hold up his hands, and when I told him that he immediately reached in his pocket to get his revolver, and then I shot him. I had a 38 revolver. I bought the gun on Halstead street in Chicago. I think it was an Iver Johnson gun. I then threw the gun away, and threw it in the weeds. When I shot him I ran down Exchange street. My idea was to hold him up, as I thought he carried the money with him. I was sitting on Exchange street when he drove away from the theater. I was all alone. I bought the gun in Chicago

about five weeks before that. I wanted to have it for the house. I paid $6.50. I can show where the gun was purchased on Halstead street near Van Buren street. I never said anything to any one that I shot him. I went home and stayed home until Sunday afternoon; and Monday morning I went to work as usual. I knew Charley died Sunday night. I was anxious to find out how Charley was getting along. The first man that came into the garage there that night was a young man by the name of Russo. Then I ran in back of the garage. I never tried to hold him up before. I don't think Pacini knew me. He was coming out of the light and I was in the dark. He didn't speak to me. He just reached for his gun and I shot him. I shot once, is all I can remember. I might have pulled it again. I shot first, and then he fell down, and then he got up and started to fire and hollered for help.

"I make this statement of my own free will, and with no promise of immunity."

The above statement was signed by the defendant and was sworn to before the clerk of the municipal court.

Defendant's counsel objected to the admission of the confession on the ground that it had been secured by duress. As to the making of the confession defendant testified, in substance, that on the night of September 27th he had gone to bed about 8:30; that the officers came and took him about 11 o'clock; that after being questioned about the robbing of a pool-hall known as Tony's Place he was confined in a cell downstairs; that soon he was brought upstairs and the questioning continued; that he denied robbing the place; that the officers then began beating him with parade clubs about the shoulders and arms, and that in order to escape the punishment he said he had robbed the place and that he had the money at home.

It appears that the officers made several trips to defendant's home in search of money, and that the wife finally gave them about $250, and that *Lang* was taken to the house to assist in a search for more.

Concerning the action of the officers after they had returned from a fruitless search for money defendant testified:

"Then they told me they couldn't find it and hit me some more. They were mad about it. They hit me quite a few times on the arms and back. They kept striking me, and then they wanted me to confess more robberies, and so to avoid further punishment I kept on saying it. I was telling everything that came into my head. I did it to avoid further punishment. I didn't want to be beaten any more. . . . They showed the money to me, then they put the money away and started wanting me to confess more things. They started beating me and then I kept on mentioning other business people."

Concerning the making of the confession in question defendant testified:

"Wade and Bienemann and this here '17' started asking me if I killed Charley Pacini. I told him, 'No, I didn't do it.' Three of them started pounding me. I says 'No, I didn't do it, so help me God. I didn't do anything like that at all. I didn't do no wrong.' They kept it up quite a while and at last Bienemann made me get up against the wall again and they pounded me and told me to say I did it. Wade and this here '17' and Bienemann pounded me. Bienemann told me to say I did it. Wade and number 17 were both there and insisted on my saying I did it. I finally said I did after I had been beaten. I was very weak and nervous and all in. . . . I was given some moonshine whisky by Cyzak at that time. I was fainting. I was weak. I had two drinks, and after the confession was made he said I might as well finish the bottle. They had me up against the wall, tight up against the wall. Then Bienemann says, 'I will make him talk,' and he kept on pounding, hitting me as hard as he could on my back and kidneys. He says, 'Now, you ——, say you killed Charley Pacini or I will kill you.' At last I says, 'Yes, I done it,' to stop the punishment. I had read of the murder of Pacini in the papers and had heard it discussed about town. I have no knowledge of this murder or any of the details except what I read from the newspaper."

Dr. J. F. Hastings testified as follows, in part:

"On the 29th day of September, in company with Drs. Jorgenson and Adams, I examined the defendant, *Frank Lang,* at the county jail. He was stripped and an examination made of his physical condition. There were marks on the right arm; also marks on the left side—left back—extending from the shoulder down to the edge of the ribs. This extended around on the side to a line that might be drawn from the interior portion of the axilla. The left arm was also bruised, black and blue to the elbow; and there was a discoloration, greenish yellow, from the elbow down towards the wrist. The left arm was swollen, also the forearm. The tissues of the back were somewhat swollen. There were also bruises on the buttocks; as I remember especially on the right.

"I should judge that the injuries observed by us were caused by violence of some kind which extended into the tissues and muscles, breaking the blood vessels under the skin, so that it caused discoloration, and also breaking the skin in spots. We took an X-ray to determine whether or not the left arm was fractured."

Dr. Adams testified, in part:

"I can say that these injuries were caused by violence of some kind. It must have been quite severe violence, because the discoloration was very dark and very deep. . . . *Lang* must have suffered extremely. The condition of his arm alone was such that he must have suffered very much from the injury to it; and the bruised condition of his back, his right arm, and the buttocks, the degree of bruise there must have been brought about by severe hurt."

There was testimony to the effect that Bienemann, on being asked the next day if he had heard of the *Lang* confession, remarked, "Didn't I help knock it out of him?"; that when a lady told him she had heard he helped "beat him up," he replied, "Well, maybe I did. What we ought to have done would be to kill him."

Bienemann testified in part:

"They accused me of beating him and I says 'Yes.' *Q.* That you did help beat him, did you? *A.* That is what I

told them.    I says 'Yes,' because it was told to me so often that to avoid an argument—they accused me, and to avoid an argument I gave them the benefit of the doubt and says 'Yes'."

There was also testimony that Captain Wade, on being asked if they had "beat him up," responded: "We tapped him a couple of times;" and that at another time he stated: "Yes, they had to use the clubs on him."

Wade testified: "*Lang* got kind of thirsty about 3 o'clock and asked for a drink of water.   His confession was made about 4 o'clock."

The district attorney introduced the testimony of several persons who at various times and places after the alleged confession had either talked with defendant or heard him say that he had killed Pacini in an unsuccessful attempt to rob him.    Counsel for defendant showed that from the moment *Lang* was taken into custody until the conference in the court room *Lang* had never been out of the presence of a police officer and that he had never been given an opportunity to consult friends or secure legal advice.    There was testimony by one of the officers present that at the time the confession was signed by *Lang* he was not advised of his rights and was not told that the confession could be used as evidence against him.

For the plaintiff in error there was a brief by *Buckmaster & Hammond,* attorneys, and *Robert V. Baker,* of counsel, all of Kenosha, and oral argument by *Mr. A. E. Buckmaster, Mr. Walter W. Hammond,* and *Mr. Baker.*

For the defendant in error there was a brief by the *Attorney General* and *J. E. Messerschmidt,* assistant attorney general, and oral argument by *Mr. Calvin Stewart* of Kenosha and *Mr. Messerschmidt.*

JONES, J.    In considering whether on the morning of September 28th there was a voluntary confession admissible in evidence we make full allowance for the fact that the de-

fendant was vitally interested in the result; that his story was probably exaggerated; and that under the most favorable circumstances he may not have been a very reliable witness. If his testimony had not been corroborated by other trustworthy witnesses and by the physical facts we might feel bound by the conclusion at which the trial court and the jury arrived. But there was very convincing evidence corroborating his testimony that the confession was made under duress.

Photographs of defendant's body, taken about two days after the night when his statements were made, show beyond question that he had received very recent bodily injuries. No explanation was given by the state for this condition except that the injuries might have been incurred by falling from a window after one of the burglaries claimed to have been committed; but this was pure speculation. Physicians testified that the injuries were of such a nature that they were probably caused by blows and that it was not probable that they were caused by a fall. This testimony was practically uncontradicted.

At the instance of the officers, in order that "it might help him to think," defendant stood facing the wall with his hands up for some time during the process of questioning. Statements made by the officers to disinterested witnesses were convincing that violence was used, and some of the officers even boasted of the disgraceful means they had used to obtain the confession.

The defendant was taken from his bed at 11 o'clock at night to the police station, and the ordeal of questioning began. Although at times he complained that he was thirsty and faint, he was subjected to the "third-degree" inquisition until 4 o'clock. There was not the slightest evidence of any resistance on his part at any time. Even if there had been no personal violence this treatment was an outrage which cannot be too severely condemned. In numerous cases this "sweating" process, when prolonged and so conducted as

to cause distress and mental anguish, has been held sufficient proof that the confession was involuntary. *State v. Thomas,* 250 Mo. 189, 157 S. W. 330; *People v. Borello,* 161 Cal. 367, 119 Pac. 500; *People v. Loper,* 159 Cal. 6, 112 Pac. 720; *Comm. v. McClanahan,* 153 Ky. 412, 155 S. W. 1131 (under a statute prohibiting "sweating").

After the defendant had been reduced to what was supposed to be a sufficient state of submission, about 4 o'clock in the morning one of the officers charged him with shooting Pacini. The officer testified in part as follows:

"I says 'You might as well clear your conscience now and tell the truth.' He says 'No, I didn't do that.' Then he began smiling a sickly smile. He says 'No, I didn't do that.' I says *'Lang,* if I ain't looking at a murderer now I never looked at one in my life,' and tears came into his eyes, and he says 'Yes, I might as well tell the truth; I shot Charley.' "

The testimony on this branch of the case convinces us beyond doubt that the statements of the defendant made under these circumstances, and which were relied on for his conviction, were made under duress which amounted to torture. The officers in charge of the prisoner on that night did not seem to realize that they were living in the twentieth century. In order to secure what they called a confession they adopted methods which might have been approved in the seventeenth century, when, on confessions procured by torture, persons were imprisoned and executed as witches, and when in state trials prisoners obnoxious to the ruling monarchs or their servants were condemned because, on the rack or under the lash, they had confessed their guilt.

The officers who secured the alleged confession in this case may have been sincere in their belief that the defendant killed Pacini and that the end justified the means. But officers of the law should understand that prisoners in their custody, even suspected felons, have sacred rights which must be respected, and one of these is freedom from such

violence as was inflicted in this case. For more than a century and a half such treatment of prisoners has been condemned by the courts of England and America, and there is no better settled rule of law than that confessions must be voluntary to be admissible in evidence. The rule and the reason were well stated in an English court in 1783 as follows:

"Confessions are received in evidence, or rejected as inadmissible, under a consideration whether they are or are not entitled to credit. A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and therefore it is admitted as proof of the crime to which it refers; but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape when it is to be considered as the evidence of guilt, that no credit ought to be given to it; and therefore it is rejected." *King v. Warwickshall,* 1 Leach's Crown Cas. (4th ed.) 263.

It is the rule recognized in every treatise on evidence and in every state and was long ago declared by this court. *Schoeffler v. State,* 3 Wis. 823; *Flamme v. State,* 171 Wis. 501, 177 N. W. 596; *Bianchi v. State,* 169 Wis. 75, 171 N. W. 639; *Roszczyniala v. State,* 125 Wis. 414, 104 N. W. 113. The reason generally assigned for rejecting confessions induced by violence or threats, or hope of reward, is that such testimony is too unreliable to sustain convictions for crime. But other cases also give as a reason that the reception of such evidence violates the constitutional privilege against self-incrimination. See the elaborate opinion of Mr. Chief Justice WHITE in *Bram v. U. S.* 168 U. S. 532, 18 Sup. Ct. 183.

The cases in which the rule is most often applied are those where there have been threats of injury or promises of favor. There are numerous cases where confessions extorted by mob violence have been rejected. 16 Corp. Jur. 729. But it is creditable to the administration of justice in this country that there are comparatively few cases where

police officers have used actual violence to secure confessions.

Several decisions of this court are relied on by counsel for the state to sustain the contention that the statements made by defendant to the officers on the night in question were properly received. *Hintz v. State,* 125 Wis. 405, 104 N. W. 110; *Roszczyniala v. State,* 125 Wis. 414, 104 N. W. 113; *Tarasinski v. State,* 146 Wis. 508, 131 N. W. 889. No violence to the prisoner was shown in these cases, and they all recognize the rule that confessions must be voluntary to be admitted in evidence. The rule has been declared in several recent decisions of this court in which it was held under circumstances far more favorable to the state than those in the present case that the convictions should be reversed because the confessions were involuntary. *Bianchi v. State,* 169 Wis. 75, 171 N. W. 639; *Flamme v. State,* 171 Wis. 501, 177 N. W. 596.

We recognize the rule that the admissibility of evidence as to the confession was for the determination of the trial judge in the first instance and that his decision should control unless it satisfactorily appears from the record that such decision was clearly against the evidence. *Connors v. State,* 95 Wis. 77, 69 N. W. 981; *Roszczyniala v. State,* 125 Wis. 414, 104 N. W. 113. But we are forced to the conclusion that the overwhelming weight of testimony established the fact that the statements made by the defendants were drawn from him through fear and even terror.

Although for convenience we use the word "confession" in this opinion, there was in fact no real confession during the night of horror which the testimony describes. We are convinced that the defendant was so maltreated that to escape further abuse he told whatever tales he thought would please his accusers. We therefore hold that the confession obtained on the morning of September 28th should not have been submitted to the jury.

The next question for consideration is whether the subsequent statements of the defendant called confessions were voluntary. In the record there is an elaborate and able opinion by the trial court. We infer from it that he believed that the defendant was subjected to abuse by the officers on the night when he was taken into custody. But the court came to the conclusion that in making subsequent statements the defendant was under no coercion and that these statements were voluntary.

After defendant's sleepless night he was taken to Chicago by the officers to aid them in securing evidence to incriminate himself. They testified that he repeated parts of the confession on the journey, and two police officers from Chicago also testified to similar statements by him. Throughout the day he was in irons going from place to place with the officers. On the same day they returned to Kenosha and about 6 o'clock the police called in six persons, members of the Pacini family and their friends, and parts of the confession were repeated. Several others saw him during the evening in his cell and he admitted having killed Pacini.

During all these interviews one or more of the policemen who had abused him the night before were present.

The next morning he was taken to municipal court. He knew that his confession had become public, was in fear of being mobbed, and wanted "the more officers the better" to accompany him. The municipal judge explained that he would have the right to have an attorney and an examination, but defendant said he wanted to plead guilty. He was then taken to the circuit court and was informed that if he pleaded guilty he would be sentenced to state prison for life. He said he understood and pleaded guilty.

Then Mr. Buckmaster, who afterward appeared for him as attorney, came in and told the court he had heard that the confession had been obtained by duress. On retiring to

another room, in the presence of the judge and others the question was asked, *"Lang,* did you kill Pacini?" and he said "No, I didn't."

In determining whether the later confessions should be received the rule to be applied is thus stated in Corpus Juris:

"Although a confession may have been obtained by such means as would exclude it, a subsequent confession of the same or like facts may and should be admitted, if it appears to the court, from the length of time intervening or from other facts in evidence, that the influence of the promise or threat had been removed. But where a confession has been obtained under circumstances rendering it involuntary and inadmissible, a presumption exists that any subsequent confession arose from a continuance of the prior influence, and this presumption must be overcome before the subsequent confession can be received in evidence. The controlling influence which produced the prior confession is presumed to continue until its cessation is affirmatively shown, and evidence to overcome or to rebut this presumption must be very clear, strong, and satisfactory; if there is any doubt on this point the confession must be excluded." 16 Corp. Jur. 722, 723.

This statement of the law is sustained by many authorities. *Flamme v. State,* 171 Wis. 501, 177 N. W. 596; *Thompson v. Comm.* 20 Gratt. (Va.) 724; *State v. Drake,* 82 N. C. 592; *People v. Johnson,* 41 Cal. 452; *State v. Brown,* 73 Mo. 631; *Deathridge v. State,* 33 Tenn. 75; *Mackmasters v. State,* 82 Miss. 459, 34 South. 156; *Smith v. State,* 74 Ark. 397, 85 S. W. 1123; *Comm. v. Sheets,* 197 Pa. St. 69, 46 Atl. 753. See cases cited in 16 Corp. Jur. p. 723, § 1481.

The defendant testified that the reason he did not assert the truth was that he feared he "would be beaten some more, there were always officers around." We might not accept this statement if it were not strongly corroborated by the preceding facts, and if the fear was unreasonable under all the circumstances. We infer from the testimony

that defendant was weak morally, intellectually, and physically. He had been sadly addicted to drink. In the interval of about thirty-four hours between his seizure and his appearance in court he had gone through experiences which ill fitted him to act with resolution or good judgment. There had been no warning at any time that his confessions would not criminate him unless voluntarily made. He had good reason to believe that a repudiation of his confessions would anger the officers who had maltreated him. It is significant that at the first instant when an attorney appeared who in his judgment could give him some help or protection he denied his guilt. The lapse of time between the first confession and the others was very brief. Much longer periods of time have been held insufficient to remove the fear or hope of favor which led to the original confession. *Flamme v. State, supra; U. S. v. Cooper,* 25 Fed. Cas. 629; *State v. Chambers,* 39 Iowa, 179; *Dinah v. State,* 39 Ala. 359. We are convinced that the controlling influence which exacted the first confession had not been removed when defendant entered his plea of guilty, and that the state failed to meet the burden which the law in such cases imposes.

Error is assigned on the claim that there were erroneous instructions given to the jury. Among the instructions were the following:

"Evidence of confessions made by the defendant that he killed Pacini has been received in this case. The mere fact that a confession was made without the accused having been cautioned or warned that it might be used against him, if you find such to be the fact in this case, does not render it unworthy of credit, if otherwise credible. The mere fact that a confession was made or elicited in an examination by police or others in authority, while the accused was in custody or confinement, does not render it unworthy of credit, if otherwise credible, or stamp it as involuntary or as given under duress.

"If you believe that any confession in evidence was ob-

tained by abuse, force, threats, or coercion, or while, according to the evidence, the defendant was under the influence of fear of physical punishment by those having him in custody, then you may, if you believe it false and unworthy of credit, reject any confession so obtained. The burden of proof that confessions were voluntary and not obtained by improper means is upon the state."

It is conceded by counsel for the state that part of the second paragraph was erroneous, in that it did not require the jury to reject the confessions if *involuntary*, but also made the *falsity* of the confessions a condition of rejection. But it is claimed that the error was cured by other portions of the charge and was not prejudicial.

The cases already cited show that when a confession is involuntary it should be rejected. When it is submitted to the jury to find whether it was involuntarily made or induced by fear or hope of favor, that is the first and prime question for their consideration. If in this case they had believed the confessions to be true but that they had been obtained by personal violence, it would have been their duty, under proper instructions, to reject them entirely. Numerous witnesses testified to the confessions and thus gave to the state the aid of their influence. The jury were probably deeply impressed by the claim that the confessions were true, but they were in effect told that they should not be rejected unless false and unworthy of credit.

It is true that in other parts of the charge the jury were told that unless the confessions were voluntarily made they should be rejected; that the burden of proof that they were voluntary rested on the state; that if they found that the original confession was not voluntary it was the presumption of law that the coercion continued. Full instructions as to the presumption of innocence and other subjects involved in the case were given, and the trial court evidently sought to give the accused a fair trial.

Nevertheless we do not find in the entire charge any

clause which might remove the inference to be drawn from it that the falsity of the confession was a condition to its rejection. That inference was rather confirmed than removed by the following instruction:

"You are at liberty to accept or reject the whole or any part of any or all of the confessions accordingly as you are satisfied by the evidence that they or any part of them were obtained or made under proper or improper influence or conditions and accordingly as you are satisfied by the evidence they are entitled to credit or not, just as you are at liberty to so treat any of the evidence in the case."

In considering whether the instruction objected to was prejudicial it is important that there was no evidence in any manner connecting the defendant with the crime except his confessions. The vital question in the entire case was whether they were voluntary. The charge was in writing and taken by the jury to their room. It is not improbable that they may have believed that the all-important question was whether the confessions were true, and they may have given far too little attention to the manner in which they were secured.

Errors were assigned as to other portions of the charge, the admission and rejection of evidence, and the remarks of counsel for the state in the argument to the jury, which it becomes unnecessary to consider. Nor is it necessary to discuss the motion for a new trial based in part on the claim that there was newly-discovered evidence and that counsel appointed to assist the district attorney was interested in the result. When the prosecution rested, defendant's counsel moved that defendant be discharged. Considerable testimony was afterward received, and after verdict there was a motion for a new trial but no renewal of the motion to discharge the defendant.

On the whole record we are compelled to hold that defendant did not have a fair trial and that the judgment should be reversed.

*By the Court.*—Judgment reversed, and cause remanded for a new trial. The warden of the state prison will deliver the plaintiff in error, *Frank Lang,* to the sheriff of ·Kenosha county, who is directed to keep the said *Lang* in his custody until discharged therefrom by due process of law.