[Crim. No. 2127. Second Appellate District, Division One.—December 17, 1931.]

THE PEOPLE, Respondent, v. LLOYD W. DYE, Appellant.

Catherine A. McKenna and J. Irving McKenna for Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, Buron Fitts, District Attorney, and Tracy Chatfield Becker, Deputy District Attorney, for Respondent.

CONREY, P. J.—By indictment of the grand jury, appellant Lloyd W. Dye and one Gordon E. Gauss were accused of the crime of murder, alleged to have been committed by them in the county of Los. Angeles on the eighteenth day of May, 1930, in that they did at said time and place wilfully, etc., kill and murder one Albert Wade Horton. By verdict of the trial jury Gauss was acquitted and Dye was convicted of murder of the second degree. Defendant Dye appeals from the judgment and from an order denying his motion for a new trial.

The first three grounds for reversal, upon which appellant depends, are stated by his counsel as follows:

"One: That an alleged confession of the defendant Dye was erroneously admitted by the court; as the *voir dire*

examination established that it was procured under duress and oppression, and by threats and promises of immunity, made by the arresting officers while defendant was held concealed in solitary confinement, and denied counsel, or the right to communicate with friend or family, and subjected to a most outrageous third degree treatment at the hands of the arresting officers.

"Two: That the evidence admitted by the court over the objection of the defendant Lloyd Dye, was incompetent, and its admission was prejudicial to the rights of the defendant.

"Three: That the evidence is insufficient to support the verdict."

In connection with the points thus presented, appellant suggests that, leaving out of consideration the purported confession, the evidence was wholly circumstantial, and he insists that the whole of the circumstances were of such nature that they did not in any way tend, to show any connection on the part of appellant with the death of said Albert Wade Horton. Preliminary to a consideration of the alleged errors, it will be useful to examine and see whether this last assertion of counsel is supported by the record.

On the night of May 18, 1930, said Albert Horton was found dead on the front porch of his house in Mint canyon. It is established by the evidence that his death was caused by a bullet wound; that the bullet entered through the back and passed through the vital organs, including the heart. There is uncontradicted evidence that it would have been impossible for the wound to be self-inflicted. The autopsy surgeon testified that the wound was made by a bullet of medium size, anywhere from a "32" to a "38". Thus, it was a proven fact that the man had been killed by someone, and it only remained to identify the killer and to establish the circumstances under which the killing was done.

The deceased Horton was sixty-nine years old and lived on the Mint canyon place with his brother George, who was ninety years old. Apparently, George was the only other person staying in the house at the time of the killing. George died about a month after the eighteenth day of May, 1930, and the record contains, of course, no testimony given by him. It was the theory of the prosecution at the

trial that appellant and Gauss, for purposes of robbery, came to the Horton house in the automobile of appellant; that they turned the horses out of the corral, in order to attract the attention of the Hortons; that when Albert Horton came to the door, a struggle took place between him and appellant, in the course of which Horton shot appellant in the abdomen with a pistol which Horton had in his hand, and that then appellant fired with his own pistol the shot which killed Horton.

Careful examination was made of certain tire tracks in the vicinity of the Horton house, from which witnesses acquainted with the subject and who had made special study of identification of tire marks and tires, testified that an automobile which came to the ranch at the time of the murder was running on three Goodyear tires and one Firestone, of a stated size, "29 4/50". The Firestone was on the right rear wheel. Evidence was produced that in February, 1930, at Long Beach, appellant, under the name of Don Parks, obtained from a dealer in Long Beach a 1927 Pontiac blue roadster with a khaki top; that the car was repossessed "by the finance company" and brought back on May 20th; that the car was later sold, with the same tires, to a purchaser named Blake. The witness Love, a special investigator of tire identification, examined the Blake car and found that the tire size was 29x4/50. The tire on the right rear wheel was a Firestone. This witness gave it as his opinion that the tire prints at the Horton ranch, as photographed, were of the same type of tire which he found on the Blake car. The agent of the company which repossessed the car found it in an alley at Long Beach, and the car did not then have a top on it. About a week later a manager for the dealer who had sold the car to appellant, saw appellant and asked him where the top was. Appellant told him that he had removed the top and that it was torn a little on the top. Witnesses who examined the premises at the ranch immediately after the murder, testified that in following the tracks of the automobile which had been there, they found that it had gone under a tree on which limbs had been broken from the lower branch; that some of the parts of the broken twigs were right on top of the tire tracks. However, there was evidence concerning the height of the limbs or branches of the tree, and that their

nearest point was 5.55 feet from the surface of the ground. Also, there was evidence concerning the height of appellant's car that the distance to the highest point of the top would be 65⅛ inches.

It appears from the evidence that on the ninteenth day of May, 1930, appellant went to a physician in Long Beach to obtain treatment for a gunshot wound in the abdomen. At that time appellant claimed that he had been shot by the husband of a woman whom he had been visiting. But the witness Crane, a young woman friend of appellant, testified to two statements made by appellant to her on that subject. She said that on May 19th appellant told her he had been shot by the husband of some woman; but also, she said that on the twenty-fifth day of May appellant told her he had been up to Saugus and got shot by a rancher. (Saugus is near Mint canyon, and would not be far from the Horton ranch.) The bullet was not removed from appellant's abdomen. The nurse testified that the wound was "about the size of a nickel".

The evidence shows that the Hortons had in their house, prior to the time of the murder, a revolver (a "Bulldog" 44), which had been given to them by their nephew. This revolver was not found in the house after the murder. In September, 1930, following a clue which had been given by defendant Gauss to officers, this revolver, together with another which had belonged to Gauss, was found buried near a telephone pole near the Horton ranch.

Immediately after the dead body of Horton had been found, officers were sent for, who came and inspected the premises. One of them, Deputy Sheriff Bright, identified exhibit No. 5 as being a bullet which he saw on the porch floor about four inches from the foot of Horton. At the same time he found a shell and a pipe; the shell (exhibit No. 45) was a .32-caliber Remington. The witness Crossman, a ballistic expert, gave testimony concerning the bullet, exhibit 5, and particularly concerning the kind of gun from which it had been fired. He said that it is an actual .31 caliber; that it comes from a .32 automatic cartridge. While he was unable to state positively the kind of gun it was fired from, he said that "the bullet coincides closely with the test bullets and data in my files covering a German automatic pistol known as the Dreyse; it also comes very

closely to a German automatic pistol known as a Stock, but more close to the Dreyse''. The witness Flynn testified that in November, 1928, he let one Bart Jenkins have a .32 automatic pistol marked "made in Germany", the side panels of which were wood and which he had painted green. He identified exhibit No. 5 as about the size of bullet used in that pistol. The witness Jenkins testified that in February or March, 1930, he sold to appellant Lloyd Dye a pistol, "a foreign made gun", which he had obtained from Flynn; that it had on it a German or Austrian name; that it was .32 caliber with panels which had been painted green. In a conversation with the officers after appellant's arrest, but prior to the date of the alleged confession which is the subject of complaint on this appeal, appellant admitted to the officers that he had had a .32-caliber gun which had the words "made in Germany" on it, but he said that "some time during April" he had thrown it into the ocean.

In the brief of counsel for appellant they have given us an extended statement of their version of the evidence, without quotation of the testimony of the witnesses and without giving the pages of the record where such testimony would be found, except the testimony relating to the alleged confession and relating to the manner in which same was obtained. By thus omitting to set forth the testimony in proper form or with proper record references either in the brief or in a supplement thereto, counsel have not only ignored the rule governing the preparation of briefs, but have prevented the court from following their statements through the record. But with the assistance of the brief of the attorney-general, where the testimony of the witnesses is stated with appropriate references to the record, we think we have been able accurately to make the foregoing statement of the evidence. From the facts thus obtained and which in much greater detail are contained in the record of 2,371 pages, we are led to the conclusion that there is abundant evidence tending to connect appellant with the commission of the crime, and, in fact, evidence sufficient to have sustained a conviction if such conviction had been secured without the confession which counsel insists was improperly admitted.

We come now to a consideration of appellant's contention that the confession obtained from him was erroneously

admitted in evidence by the court. On the evening of September 5, 1930, appellant was arrested by Officers Gray and Penprase, who were deputy sheriffs. The arrest was made by the officers without a warrant. The confession was obtained from him on September 12th. During the intervening week appellant was kept secretly in jail, without being taken promptly before a magistrate as the law requires, and without being allowed communication with counsel or friends. We may say at once that, if the testimony of appellant describing the treatment to which he was subjected during that interval stood uncontradicted as the only evidence on the subject, it would have been a gross error to admit in evidence a confession so obtained. But his testimony is contradicted by that of the officers, who testified that they did not use threats, promises or mistreatment of any kind in obtaining the confession. But it is further necessary to give attention to the facts admitted by the officers, as well as those asserted by them, in order to properly determine whether or not as a matter of law the court was entitled to receive the confession in evidence. The testimony of officer Penprase shows that the arrest was made at Long Beach at about 5 o'clock in the evening of September 5th; that after visiting appellant's room, and after allowing him time for dinner at his boarding-house, they took him to a police substation on Fairfax - Avenue in Los Angeles; that from 8:30 in the evening until 2 in the morning, during all of that time, either Penprase or Gray was questioning the defendant; that after 2 o'clock they took the defendant to a police station at Beverly Hills, where he was allowed to go to bed; that on September 9th, in the jail at Beverly Hills, the same officers were with the defendant for the six hours from noon until 6 o'clock, during ·which time they were questioning him continually; that the officers had figured out in their own minds what had happened at the Horton ranch, and used that as a foundation upon which to base their questions; that these officers did not see defendant again until September 12th, when they took him from the Beverly Hills jail and brought him to the county jail in Los Angeles; that the statement or confession signed by defendant and offered in evidence at the trial was obtained at the county jail on September 12th. In the testimony of Officer Gray he

admitted that on leaving defendant in the police station at Beverly Hills, he left instructions that they were not to let anybody see the defendant or permit him to send out any messages. Mr. Gray admitted a conversation with Mr. McKenna prior to September 12th, in which Mr. McKenna (defendant's attorney in this action) asked where the defendant was, to which Gray replied that he was being held in an outlying jail. The conversation, as admitted by Gray, shows that the attorney was trying to find the defendant, and that the sheriff was seeking to prevent the attorney from finding the defendant. Finally McKenna suggested that he would get a writ of *habeas corpus*, to which Gray replied that then he would be compelled to produce the defendant.

The conversation of September 5th, between the officers and appellant, was taken down by the shorthand reporter Hueston, and is in evidence. It shows a persistent questioning of the defendant about various matters, many of which related to the tragedy at Mint canyon, including a direct charge, which defendant denied, that he had shot Albert Horton in Mint canyon on the night of May 18th. During the night the defendant became weary and sleepy, but the questioning went right on. Officer Gray admitted that twice he told defendant "to sit up in his chair"; that the defendant "may have been nodding; he was not asleep". In view of the inquisition that was going on, and the condition of the prisoner, these orders were in effect a kind of coercion. The circumstances of the questioning, and the method thereof, were well calculated to force a confession of guilt, but the process was not at that time successful. It was only after six hours more of questioning on September 9th, followed by three days more of secret imprisonment, that the confession was finally obtained on the 12th. Considering the wearing-out process of inquisition, the secrecy of the imprisonment, the isolation of the defendant and the unlawful failure to take the defendant before the magistrate (Pen. Code, secs. 821, 824, 849 and 145) the transaction has all the earmarks of a deliberate attempt to force a confession by every means short of promises, direct threats or actual violence. The question presented is this: Can a confession so obtained be accepted as a confession freely and voluntarily given?

The law on the subject of confessions has been very definitely settled; the difficulties lie in its application to particular cases. The admissibility of a confession, when offered in evidence, is a preliminary question for the court. (*People* v. *Ferdinand,* 194 Cal. 555, 567 [229 Pac. 341].) Ultimately, if the evidence is admitted, it is for the jury to determine whether the confession was freely and voluntarily made, and therefore entitled to consideration. (*People* v. *Bateman,* 80 Cal. App. 151, 156 [251 Pac. 335].) But first there must be evidence from which it is possible to determine that the confession was thus made. The burden is upon the prosecution to prove the voluntary character of a confession. "It is a fundamental rule of criminal law that a confession may not be used against a defendant unless the prosecution can show its free and voluntary character; that it was made without previous inducement and that neither duress nor intimidation caused defendant to furnish such evidence against himself. (*People* v. *Miller,* 135 Cal. 69 [67 Pac. 12].) It is also true that if threats and inducements are made to a prisoner, and within a few days thereafter he makes a confession, such acknowledgment of the commission of the crime may not be introduced in evidence unless it clearly appears that the threats and inducements had ceased to operate upon his mind to bring about his statement of his own guilt. (*People* v. *Johnson,* 41 Cal. 455.)" (*People* v. *Loper,* 159 Cal. 6, at p. 14 [Ann. Cas. 1912B, 1193, 112 Pac. 720, 723]. See, also, *People* v. *Russell,* 77 Cal. App. 113, 118 [246 Pac. 110]; *People* v. *Quan Gim Gow,* 23 Cal. App. 507 [138 Pac. 918].) To "threats and inducements" we think it appropriate to add, any illegal process whereby through external means of pressure the free will of the defendant has been overcome.

Counsel for respondent have quoted from some decisions and from 16 C. J. 729, and from Wigmore on Evidence, from which they state that the principle upon which a confession is treated as sometimes inadmissible is that under certain conditions it becomes untrustworthy as testimony. From this premise we are asked to approve the proposition (Resp. Brief, p. 94), that the question whether improper influences have so *impaired the probable truth* of the confession as to make it unreliable should be first determined by the trial judge. In other words, we are asked to establish

an unique rule that the competency of evidence offered for submission to a jury shall be tested by the judge's opinion about its credibility. This we think that the court should decline to do.

▇ We may reject, for present purposes, the testimony of the defendant concerning the treatment to which he claims to have been subjected while in jail. The case for the prosecution cannot be stronger than the admitted facts, to which we have referred. On those facts alone we are of the opinion that the court erred in overruling appellant's objections to the purported confession when offered in evidence against him.

▇ Mere error is not a sufficient reason for reversing a judgment. An appellant must also satisfy the court, on appeal, that by such error he was deprived of the right to a fair trial, and therefore that his conviction has become a miscarriage of justice. We have said that in this case the evidence, exclusive of the confession, would have been sufficient to sustain the verdict. But this is far from saying that a jury to which that evidence (without the confession) had been submitted would have been satisfied beyond a reasonable doubt, that the defendant was guilty of the murder. In the determination of this appeal, can we be justified in saying that the circumstantial evidence upon which the state must rely, when taken together with the evidence received on behalf of the defendant, so strongly established the guilt of the defendant that the jury, in the performance of its duty, could not reasonably have failed to find him guilty? Is the case so clear that, in spite of the erroneous admission of evidence, there was no miscarriage of justice?

"The right of the accused in a given case to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time illegally deprive them of life or liberty. 'It is an essential of justice that the question of guilt or innocence shall be determined by an orderly procedure, in which the substantial rights belonging to defendants shall be respected.' (Opinion written by Mr. Justice Sloss in *People* v. *O'Bryan*, 165 Cal. 55 [130 Pac. 1042].) " (*People* v. *Wilson*, 23 Cal. App. 513, 524 [138 Pac. 971, 975].)

In the case at bar it is the claim of appellant, not only that the court erred, but that the error has resulted in a conviction which probably would not have resulted in the absence of such error. We have outlined the circumstances shown in evidence, which point to the defendant as the guilty man. That they unerringly so indicate, is not so plain that we dare to say it, although if such a case could go upon a mere preponderance of the evidence we might by that standard reach a different conclusion. On the other hand, the defendant by his own testimony denied that he shot the deceased, and denied that he, the defendant, was at or near the Horton ranch at the time of the murder or at any time. He testified that just before 6 o'clock on the evening of May 18, 1930, he went in his own car from Long Beach, down the coast to Balboa, and at 9 o'clock arrived at his father's house at Costa Mesa, and stayed there until 10 o'clock the next day. The defendant's father, his mother and his brother all testified that defendant was at their home at Costa Mesa the night of the murder. Counsel for the people, in their brief, refer to the testimony of these three witnesses, but do not suggest any inconsistencies or other defects therein. The testimony of the parents is that he arrived at home at 9 in the evening. The testimony of the brother is that defendant was there, in bed, at 4 the next morning. According to the testimony of Mrs. Larimer and Miss Larimer, defendant was in their house at Long Beach until after 4 o'clock on the afternoon of the 18th. The distance from Costa Mesa to Mint canyon by the most direct route was shown to be not less than eighty miles. The distance from Long Beach to Mint canyon is (we will assume) not less than sixty miles. From the foregoing it will be seen that there was evidence on which a jury might have rested, leaving something more than a slight shadow of doubt that the defendant was at the Horton ranch at the time of the murder. Also there were some defects in the state's net of circumstantial evidence. Counsel for the state say (Resp. Brief, p. 110) that the evidence shows that "somebody who committed the crime wore shoes approximately the size of defendant Dye's shoes", but they do not tell us where to find such testimony in the record. We have found only the testimony of Officer Penprase (Rep. Trans., pp. 945 to 949) that on the morning of the 19th

he found "tracks west of the house in the alfalfa field"; and some other foot-tracks near by the ranch, some leading to and others from the ranch. But we have not found any testimony showing that any of these foot-tracks were measured or that they were of the size or shape of any tracks that could be made by defendant's shoes.

We deem it useless to pursue the inquiry any further. The case is one where the zeal of prosecution has gone beyond the boundaries of justice, and where liberty has been lost without the rightful sanction of law. It is for such cases that appeals exist.

The judgment and the order denying appellant's motion for a new trial are reversed.

Houser, J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 30, 1931, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 14, 1932.

Waste, C. J., and Shenk, J., dissented.