[Crim. No. 4503.   In Bank.   Aug. 1, 1944.]

THE PEOPLE, Respondent, v. PRESTON SAMUEL JONES, JR., Appellant.

Henry W. Hache for Appellant.

Robert W. Kenny, Attorney General, and Ralph W. Scott, Deputy Attorney General, for Respondent.

GIBSON, C. J.—Defendant Jones and Charles Ivan Baa were jointly tried and convicted under an information charging murder, conspiracy to commit robbery, and robbery. A judgment imposing the death penalty on Baa was affirmed in *People* v. *Baa, ante,* p. —— [150 P.2d 1]. Defendant being only seventeen years of age at the time of the commission of the offenses was sentenced to life imprisonment. (See Pen. Code, § 190.)

Tom Din Toy, a Chinese, was robbed and shot about 1:30 o'clock on the morning of October 5, 1942, as he entered the hallway of the Service Hotel in San Diego. Two men were seen to follow Toy into the hallway of the hotel, and immediately thereafter a shot was heard and two men ran from the hotel into the street. Baa was taken into custody as he attempted to hide from the police under an automobile parked near the hotel entrance. The other man escaped. Baa was identified by Toy and by a hotel clerk as the man who did the shooting. He was also identified by a sergeant of the United States Marine Corps and two police officers as one of the men who ran from the hotel immediately after the shot was fired.

Defendant was arrested approximately one month later in the city of Los Angeles where he lived. None of the witnesses who identified Baa as being at the scene of the shooting was able to identify defendant. One of the officers who saw the two men run from the hotel entrance, and who immediately took Baa into custody, said he could not identify defendant as the second man and that to his knowledge the first time he ever saw defendant was in the courtroom. He added that the man being pursued and fired at by his fellow officer seemed to "stagger," "slip" or "drop" in a position as though hit. It was not shown that defendant ever suffered a gunshot wound. The second officer testified he pursued and fired three times at the escaping man, who fell as he turned the corner. He also was unable to identify defendant as the man he pursued. A chambermaid in the hotel where Baa had a room said he lived there with a man known as "Little Willie"—who was not the defendant.

The uncontradicted evidence, including the testimony of Baa, is that Baa and his companion followed Toy across the street to the Service Hotel immediately before the shooting. The Dew Drop Inn, a restaurant, was located diagonally across the street from the Service Hotel. Mrs. Fanny Batts, one of the owners of the Dew Drop Inn, called by the prosecution, testified that a minute or two before the shooting she saw two men standing in a doorway near her restaurant and across the street from the Service Hotel. One of these men she positively identified as Baa, and she testified that his companion "was a Filipino or Mexican." (Defendant is a Negro.) The witness was not asked any further questions

on direct examination concerning Baa's companion, and it does not appear that before giving her testimony she knew defendant was a Negro. On cross-examination she was asked if it was a Negro with Baa and she replied, "It wasn't a Negro." Defendant was requested to stand and the witness was asked if he was the man she saw with Baa. She answered "Absolutely not . . . It wasn't him."

Dan Wysinger, a Negro boy, who was taken into custody by the police in connection with the investigation of the crime, testified that he had known defendant for some time, and that on Sunday evening, about three hours before the shooting, he saw defendant with Baa and another man walking together. The witness asked defendant where he was going and defendant said he was going "to knock over, to knock out a job" and that he "would have to get some money before daylight in the morning."

DeHart Box, a friend of Wysinger called by the prosecution, testified that he saw and talked to defendant at the Dew Drop Inn about fifteen minutes before the shooting. Defendant told Box "he had won $86 and was going home." Box stated that he and defendant left the Dew Drop Inn together, that as they came out he saw a person who looked like Charles Baa standing near the entrance to the restaurant, and that "he was just standing there. He didn't speak or say anything." Defendant and Box walked down the street together and stopped at a near-by poolroom where they parted. About ten minutes later Box heard a shot. The witness was confused as to times and places, and his testimony, which is conflicting, is here stated most favorably to the prosecution.

The foregoing evidence is clearly insufficient to establish that defendant was guilty of any of the offenses charged. The only other evidence connecting defendant with the crime was an oral confession which Officer Wells of the San Diego Police Department testified defendant freely and voluntarily made to him on November 7, 1942, at police headquarters in San Diego. Prior to the admission of the purported confession, the trial judge received evidence of the circumstances relating thereto. At the conclusion of this evidence, Officer Wells was permitted to testify, over the objection of defendant, to the oral confession which he stated defendant made to him. The following is a recital in substance of the testimony

of defendant given on *voir dire* examination and as a witness in his own behalf:

In 1942, defendant was living in Los Angeles where he was employed as a shipping clerk by the California Walnut Growers Association at $59 a week. At the same time he worked at night as assistant manager of the Red Cap Shoe Shine Stands with locations in Hollywood and Los Angeles, for which he received a guaranteed compensation of $30 a week. On Friday, October 2, 1942, he cashed his pay check from the association and left for San Diego to visit his sister. He stayed at her house Friday night. On the night of Sunday, October 4th, defendant went with a party of friends to the "P.D.Q." café, which is in the general neighborhood of Fourth and Market Streets in San Diego. The party arrived about 11:30 p. m. and remained until about 2:30 o'clock the next morning. While they were still at the café, policemen entered and questioned everyone, including defendant, about the shooting of a Chinese earlier that night. (Defendant was corroborated as to his presence at the "P.D.Q." at the time of the shooting by a member of his party and the owner of the café.) The party went from the café to an all-night theater where they remained until 5:00 o'clock in the morning. Defendant returned to Los Angeles Monday afternoon, October 5th. He was arrested in Los Angeles on November 1, 1942, and taken to the police station where he was questioned by Officers Slager and Tetrich of the Los Angeles police. They asked defendant if he was implicated in any crime committed in San Diego. He told them he was not. The officers insisted that he was and tried to make him say so. When defendant declared he did not know anything about it, they "beat up on" him. Slager used a blackjack and Tetrich hit him with his fists. He was beaten twice a day for three days. On November 4th, Slager and Tetrich took defendant to a room in the Hall of Records and had started to beat him as they had before, when Officer Blucher of San Diego came into the room with several Los Angeles officers. Blucher told him that some people had seen him in San Diego near the place where the Chinese was shot, that one of the boys involved was caught and one of them escaped, and that he was being accused. Defendant told him he might as well tell them he "had been with the man that shot Abraham Lincoln" as to tell him

he had been involved in anything of that sort. Tetrich was standing on one side of him and Slager was on the other side with a blackjack in his hand. Slager said, ''You know you were in San Diego and implicated in what happened there,'' to which defendant replied, ''Man, I don't know nothing about that.'' Slager hit him in the stomach about three times and he fell to the floor in a cramped position, whereupon Slager and Tetrich started kicking him all over and calling him names. One of them kicked him in the groin and when he got up Slager started hitting him on the head with a blackjack. Defendant said he was crying and was afraid, and didn't know what was going on, but that he had to say something as he did not want any more beatings, so he told them he was the boy that ran away. The officers then took him into another room where there was a typist and, in answer to questions, he repeated the same story Officer Blucher had told him. On November 5th, he was taken to San Diego. When he arrived at the jail he was treated by a doctor for the groin injury and sent to the County Hospital for further treatment. On November 7th, Officers Blucher and Wells took him from the jail to a room for questioning. They did not put handcuffs on him, and when they left the jail Officer Wells told him to run ''so he could shoot'' him. Neither Wells nor Blucher struck him. When he was brought into the room he was shaking, and Blucher told him to start talking or they would give him the same treatment he had received in Los Angeles. Officer Wells had something written on a piece of paper and he asked him to sign it. Wells told defendant that someone had seen him, and if he would sign the paper he would ''get off light''—but he did not sign it. He was told two or three times if he did not talk he would get the gas chamber. Defendant further testified he did not make any statement but declared that whatever he said to Wells and Blucher was stated under fear that he would be subjected to the same treatment he had received in Los Angeles. Defendant declared he did not know Baa and had no connection with the shooting or anyone involved in it. (Defendant's testimony in this regard was corroborated by Baa, who, at the trial, repeated the story he told officers within a few minutes after his arrest, that one Jim Stewart, of whom he gave a detailed description, was his companion at the time the crime was committed. He testified that although he had seen defendant on a few occa-

sions he had never known his name or talked to him. He denied that defendant was with him when Toy was shot or was in any way connected with the crime. Willie Davis, who roomed with Baa, and who was also charged with the murder of Toy, testified he had never seen defendant before his court appearance.)

Officer Blucher of San Diego testified that he saw defendant at the homicide bureau in Los Angeles on November 4th. Later on the same day, he was present while defendant was being questioned by Los Angeles police officers. The questioning continued for about thirty minutes, during which time he was present five or ten minutes. He testified he saw Tetrich slap defendant two or three times in the face and strike him two or three times in the stomach, and that "at that time [he] was called out of the room." Blucher did not see anyone kick defendant, and did not see a blackjack. When Blucher returned to the room defendant was talking about the crime, and appeared frightened. Defendant was then taken to another room where he made a statement in the presence of a stenographer, in which he confessed being implicated in the shooting. Defendant was brought to San Diego on November 5th. On November 7th, Blucher took defendant from the jail for questioning by Wells. Blucher testified that no threats or promises were made and there was no reference to the treatment defendant had received in Los Angeles. He added that defendant did not appear to be frightened, and that he freely and voluntarily gave a statement in which he admitted being implicated in the commission of the offenses charged.

Officer Wells examined defendant on November 7th at police headquarters in San Diego in the presence of Blucher. He testified that defendant answered questions freely and voluntarily, giving an account of his movements while in San Diego between October 1st and 5th. Wells made notes of what was said as the questioning proceeded, and some time thereafter he dictated the story related to him by defendant and then destroyed the original notes. He recited in great detail the story which he said was told to him by defendant, in which defendant assertedly admitted that he was present with Baa when Toy was robbed and shot, and that he was the boy that fled from the scene of the crime. At the time

Wells conducted this examination he had been informed by Blucher of the treatment defendant had received at the hands of the Los Angeles police, and he had a copy of an unsigned statement said to have been made by defendant in Los Angeles. He testified, however, he did not mention the Los Angeles confession until after defendant told his story, and referred to it then only for the purpose of calling the attention of defendant to certain statements therein which were inconsistent with the story he had just related. Wells further stated that he did not ask defendant to sign anything. He testified that no threats or promises were made to defendant, and that he did not tell defendant to run so he could shoot him.

The uncontradicted evidence establishes beyond any question that the statement made by defendant to the police in Los Angeles on November 4th was not free and voluntary. Undoubtedly because of the circumstances under which it was made, it was not offered in evidence. Therefore, the question for determination here is whether or not, under all the circumstances, the San Diego statement made three days later was properly admitted in evidence. ▮ Before a confession is admissible it must be shown by the prosecution that it was voluntary, and made without any previous inducement or by reason of any intimidation or threat. (*People* v. *Rogers,* 22 Cal.2d 787, 804 [141 P.2d 722]; *People* v. *Loper,* 159 Cal. 6, 14 [112 P. 720, Ann.Cas.1912B, 1193]; *People* v. *Siemsen,* 153 Cal. 387, 394 [95 P. 863]; *People* v. *Miller,* 135 Cal. 69, 71 [67 P. 12].) ▮ The admissibility of a confession is preliminarily a question for the trial court to determine. (*People* v. *Lisenba,* 14 Cal.2d 403, 421 [94 P.2d 569]; *People* v. *Ferdinand,* 194 Cal. 555, 567 [229 P. 341]; *People* v. *Loper, supra,* at p. 17; *People* v. *Miller, supra,* at p. 71; *People* v. *Dye,* 119 Cal.App. 262, 270 [6 P.2d 313]; 2 Wharton's Criminal Evidence, p. 981, § 594.) ▮ But before a confession is admitted there must be evidence from which it is possible to determine that the confession was voluntarily made. (*People* v. *Dye, supra,* at p. 270.) ▮ While the weight of the evidence addressed to the circumstances surrounding the obtaining of a confession is to be determined preliminarily by the trial court, the circumstances constituting improper influences that would exclude a confession present questions of law, reviewable by an appellate court. (*Cf. People* v. *Loper, supra,*

18; *People* v. *Dye, supra,* at p. 270; *Davis* v. *State,* 90 Fla. 317 [105 So. 843, 844]; *Ashcraft* v. *State of Tennessee* (May, 1944), 322 U.S. 143 [64 S.Ct. 921, 926, 88 L.Ed. ——].)

■ If a defendant is subjected to threats or violence and within a few days thereafter he makes a confession, it may not be introduced in evidence unless it clearly appears that such improper treatment did not cause him to confess. ■ In a situation such as here presented, there is a presumption that the influence of the prior improper treatment continues to operate on the mind of the defendant and that the subsequent confession is the result of the same influence which rendered the prior confession inadmissible, and the burden is upon the prosecution to clearly establish the contrary. (*People* v. *Johnson,* 41 Cal. 452, 435; *People* v. *Loper,* 159 Cal. 6, 15 [112 P. 720, Ann.Cas. 1912B 1193]; *People* v. *Dye,* 119 Cal.App. 262, 270 [6 P.2d 313]; *Lang* v. *State,* 178 Wis. 114 [189 N.W. 558, 24 A.L.R. 690], 22 C.J.S. 1461, § 835; 24 A.L.R. 690, 695; 2 Wharton's Criminal Evidence, p. 998, § 601.) ■ The determination of the extent of the influence persisting at the time the subsequent confession is made rests, of course, upon attendant circumstances, and the inquiry is whether, considering the age and intelligence of the defendant, the nature and degree of the influence, and the time intervening between the confessions, it can be said that defendant was not induced to confess by reason of the pressure which motivated him to make the first statement, or was not influenced so to do by reason of the prior confession itself.

In *Lisenba* v. *People,* 314 U.S. 219 [62 S.Ct. 280, 86 L.Ed. 166] (14 Cal.2d 403 [94 P.2d 569]), the confession was held not to have been induced by the prior improper conduct of the police for the reasons summarized by the United States Supreme Court, as follows: Defendant "said that the interrogation [by the police] would never have drawn an admission from him had his confederate not made a statement; he admits that no threats, promises or acts of physical violence were offered him during this questioning or for eleven days preceding it. Counsel had been afforded full opportunity to see him and had advised him." (*Supra,* at p. 240.)

■ Without resolving any of the conflicts in the evidence, the admitted or uncontradicted facts show that defendant, a

17-year-old Negro boy, was arrested on November 1st in Los Angeles and, without the aid or advice of friend or counsel, was thereafter questioned and brutally beaten by the police twice a day for three days. During this period he consistently urged his innocence. On the fourth day he was again cruelly beaten and kicked until, unable to endure the torture any longer, he said he ''was the boy that run away'' because he did not want any more beatings. Following such brutal treatment, defendant was taken to San Diego by Officer Blucher, who had participated to some extent in the unlawful inquisition in Los Angeles. Defendant was then subjected to further questioning by Blucher and Officer Wells at San Diego. Again defendant assertedly admitted his participation in the robbery and shooting of Toy. While both officers denied holding out any inducements or making any threats to defendant in San Diego, under all of the circumstances, the entire situation—shown in part by defendant's uncontradicted testimony and in part by admissions of the police—is so inherently coercive that its very existence is irreconcilable with the possession of the mental freedom essential to a valid confession. Moreover, it does not appear that the San Diego police cautioned defendant that his previous confession could not be used against him. For want of such information defendant might have concluded that he could not make his case worse than he already had made it and, under this impression, might have made the statements testified to by Officer Wells. (See *Flamme* v. *State*, 171 Wis. 501 [177 N.W. 596, 598]; 2 Wharton's Criminal Evidence, p. 998, § 601.) We conclude, therefore, from facts which are not in conflict, that the San Diego confession was not voluntary and that it was improperly admitted in evidence.

The officers who secured the purported confession may have been sincere in their belief that defendant was guilty, and that the end justified the means. Law enforcement officers must understand, however, that a person suspected of crime has rights which must be respected, and that undue advantage must not be taken of his fears, hopes or weakness. For more than a century and a half the mistreatment of persons in custody has been condemned by our courts and there is no better settled rule than that confessions must be voluntary to be admissible in evidence. As stated by the Supreme Court in *Ashcraft* v. *State of Tennessee* (May, 1944), 322 U.S. 143

[64 S.Ct. 921, 927, 88 L.Ed. ——] "The Constitution of the United States stands as a bar against the conviction of any individual in an American Court by means of a coerced confession. There have been, and are now, certain foreign nations with governments dedicated to an opposite policy: governments which convict individuals with testimony obtained by police organizations possessed of an unrestrained power to seize persons suspected of crimes against the state, hold them in secret custody and wring from them confessions by physical or mental torture. So long as the Constitution remains the basic law of our Republic, America will not have that kind of government."

The judgment and order denying a new trial are reversed.

Shenk, J., Curtis, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Respondent's petition for a rehearing was denied August 24, 1944.