[Crim. No. 729.   Fourth Dist.   Feb. 2, 1950.]

THE PEOPLE, Respondent, v. ROBERT SEWELL,
Appellant.

Robert Sewell, in pro. per., for Appellant.

Fred N. Howser, Attorney General, and Gilbert Harelson, Deputy Attorney General, for Respondent.

MUSSELL, J.—Defendant was charged with the offense of murdering one Jack Latham. A jury trial resulted in a verdict of guilty of murder in the first degree with recommendation of life imprisonment.

Prior to the 21st day of December, 1945, Latham owned and operated a tire shop at 2190 Main Street in San Diego. On the evening of December 20th, Mr. Flinn, a truck driver employed by Latham, left the premises at about 5:30 and at that time Latham was in the shop and his car was parked outside. When Flinn returned to the shop the following morning, the car was in the same place as he had observed it upon leaving the night before. Flinn walked through the gate toward the shop and found Latham on his back near the door to the office, dead. Flinn observed that the place was unlocked and found an empty wallet by the body.

The police were called, the body was removed and the report and testimony of the autopsy surgeon established the fact that the deceased had extensive bruises on the head and a depressed or crushed skull fracture which caused his death. The doctor was shown a length of steel pipe found by the officers at the scene upon which there was blood, hair and pieces of tissue from skin and he testified that the wounds and injuries which he saw could have been caused by the pipe. The doctor also testified that he estimated that there were three blows struck on the head of the deceased and that all three blows could have been struck by the same type of an instrument.

The officers contacted the wife of the decedent, and she stated to them that Latham had called her within two or three minutes of 9 o'clock on the evening of December 20th; that he called to tell her that he was starting home from work and asked if there was anything she wished him to bring. She stated that she never saw her husband alive thereafter.

The defendant, who had been previously employed by Latham to recap and change tires, was picked up by the police on the 21st day of December and after being questioned at the

police department and booked as a murder suspect, was released on the same date. Prior to his release, defendant was questioned by the officers about his activities on the evening of December 20th, and he stated that he left his hotel room about 7 o'clock in the evening and went to lower Fifth Avenue in San Diego, where he visited several cafes, had drinks with several colored men, and returned to the hotel at about 9 o'clock; that soon thereafter, he again left the hotel to get some food for his wife and came back about 11:30 p. m. Shortly after this interview, defendant left San Diego and did not return until January 18, 1949. On that date he was again questioned by the officers, who observed that he was intoxicated, and placed him under arrest on a charge of drunkenness and suspicion of robbery. On the morning of January 20th, defendant was taken to the municipal court, pleaded guilty to the charge of drunkenness and was sentenced to 20 days, with one day suspended.

On the evening of January 20th, Police Officer Ormsby contacted a. Mr. Massey, a close personal friend of defendant, and was told by Massey that the defendant had admitted to him that he had gone out to the tire shop on the night of December 20th to burglarize the place and that he had hit the decedent.

The officers again questioned the defendant relative to his movements on the night of December 20, 1945, and defendant stated that he had visited several restaurants and poolhalls that evening and had engaged in a dice game in which he won approximately $87 and that he had returned to his hotel room at about 11 p. m. After this statement, and on the morning of January 21, 1949, the defendant was confronted with Massey. In the presence of the officers, Massey related what he had told the officers concerning the admission by the defendant that he had gone to the tire shop on the night of December 20th to burglarize it and had struck Latham. The defendant stated that Massey was not telling the truth and denied any implication in the murder of Jack Latham. On the following day, January 22d, the officers again questioned the defendant in the presence of Massey and the defendant stated that he wished to make a statement. He was then taken into a room in the homicide division and Miss Bohn, secretary, took and transcribed a lengthy statement in which the defendant voluntarily stated that he had gone to the tire shop at about 8 or 8:30 on the night of December 20, 1945, intending to rob the decedent; that he was not intoxicated and that

upon entering the gate to the premises, he picked up a piece of pipe; that he then observed that the decedent was checking up the day's receipts; that he waited for five or ten minutes until the decedent walked out of the door of the office into the yard, at which time, to use the defendant's words, "He walked out and I was standing right over there, and I just boom, let him have it." "He was coming out of the door. I was standing like that. He made a step, and I just crowned him." "He came out just like he is standing there, and I hit him on the head, and he fell on an angle like that, on his arm, and he didn't move, and I got kinda nervous." The defendant stated that he searched decedent's pockets, pulled out his wallet, took approximately $100 from the desk and ran out of the place; that he returned to his hotel and told his wife he had struck it rich and when she asked him where he had been, stated that he had pulled a job in Linda Vista; that the following morning, when the police came to question him, he stated that he would like to talk to his wife for a moment and then gave her all of the money except about $3.00, which he had in his pocket when the officers took him away for questioning; that he had told Robert Massey that he had gone to the tire shop to rob Latham and had struck him; that one or two days later he and his wife left for Los Angeles; that he paid his delinquent room rent of approximately $20 and bought tickets to Los Angeles with part of the money taken from the tire shop.

When shown the piece of pipe picked up by the officers at the scene, the defendant said "I guess that is it." He was asked to identify several photographs taken of the premises and marked them with his initials. The statement was written up by Miss Bohn and in the presence of the officers, the defendant read and initialed each page and made certain corrections in punctuation and spelling, after which he signed it in the presence of officers.

The defendant is proceeding *in forma pauperis* in this appeal. He contends first that it was contrary to articles IV, V, VI and XIV of the United States Constitution to proceed against him by information instead of by indictment of the grand jury. This contention is answered by the provisions of section 888 of the California Penal Code, which provides as follows:

"All public offenses triable in the superior courts must be prosecuted by indictment or information, except as provided

in the next section, and except as provided by section 359a of this code."

Defendant's next contention is that it was error for the trial court to admit his confession for the reason that his statements were not given voluntarily or freely but only under duress and through fear of physical violence. The rule is elementary that a confession of a defendant to be admissible must be proved to have been given freely and voluntarily and made without any previous inducement, promise or offer of leniency in punishment or by reason of any duress, intimidation or threat. (8 Cal.Jur. 109.) Whether a confession is free and voluntary is a preliminary question addressed to the trial court and to be determined by it. (*People* v. *Cucco*, 85 Cal.App.2d 448, 452 [193 P.2d 86] ; *People* v. *Dye*, 119 Cal.App. 262 [6 P.2d 313] ; *People* v. *Siemsen*, 153 Cal. 387, 395 [95 P. 863].)

Prior to the admission of the confession into evidence, defendant took the stand for *voir dire* examination and told a story of alleged mistreatment by the police officers. He stated that the beating took place on January 22, 1949, and was administered by Officer Hughen and another man he did not know; that he suffered from swelling of the eyes and a bad ear as after effects of the alleged beating; that when he arrived at the county jail, after the statement had been taken, his eyes were still swollen.

Defendant produced witnesses, one a lawyer, who testified that he had seen the defendant in the county jail in the latter part of January or the first part of February and that at that time the defendant had some scratches on his cheeks. There was no evidence, however, to connect the scratches with the alleged beating. Another witness stated that he saw the defendant on January 22d in the city jail and that he had a bandage around his head. However, the jailer stated that he had not noticed any bandage on defendant's head but that he used a white handkerchief to hold down his hair while he slept. Another defense witness testified that in the latter part of January he noticed defendant's ear bleeding, but on cross-examination he could not remember which ear. A doctor testified that he had examined the defendant in the county jail on March 10, 1949, and that he found a perforation of the defendant's left ear drum. On cross-examination, the doctor stated that he could not tell when the perforation occurred and that it could have occurred 10 years previous.

The prosecution introduced the testimony of Robert Massey to the effect that when he saw the defendant the second time (which was shortly after the alleged beating) he looked the same as he did all the time and that the police officers did not make any promises of reward or immunity nor did they use any force on the defendant in his presence.

Officer Hughen, who was accused by the defendant as one of the two men who beat him on January 21st, stated that he had never made any threats against the defendant or used force or violence upon him and that he was off work on the 21st and 22d days of January and did not see the defendant on those days. Records of the police department were introduced which corroborated this testimony.

A picture of the defendant taken on January 25, 1949, at the county jail failed to show any indication of defendant's eyes having been gouged or that there were any marks upon his face.

A witness, Morton L. Geer, stated that he saw the defendant about 9 o'clock p. m., January 22d, and was present while the defendant read a statement and initialed each page; that there were no marks, wounds, bruises or cuts on defendant's face at that time and that his eyes were not swollen but were normal.

Officer Maguire testified that he was present at the time the defendant gave his statement and that it was made freely and voluntarily and that at none of the interviews at which he was present was force or violence ever used upon the defendant.

Miss Bohn, the secretary who took the statement from the defendant on January 22d, testified that there were no bruises, cuts, wounds or injuries upon the face or person of the defendant; that he made no complaint to her about having suffered any such injuries; that in her opinion the statement was freely and voluntarily made and that there were no threats or promises made against or to the defendant in her presence nor was any force or violence used against him.

The testimony of the witnesses for the prosecution and defense presented a conflict as to whether the confession was freely and voluntarily made. This question was one of fact for the determination of the trial judge. His ruling was supported by substantial evidence and will not be disturbed on appeal. (*People* v. *Port,* 91 Cal.App.2d 152, 157 [204 P.2d 651]; *People* v. *Cucco, supra.*) Particularly is this true where, as in the instant case, the matter was fully developed

in the trial court where the defendant had every opportunity to present his position. (*People* v. *Mehaffey*, 32 Cal.2d 535, 553 [197 P.2d 12].) An examination of the statement given by the defendant discloses that he gave a complete account of the homicide and supplied many details which were unknown to the police officers.

The defendant further contends that he was held incommunicado in the city jail from January 18 to January 24, 1949, and that he was denied the right of counsel during that time. It appears from the record that he was booked at the city jail on the afternoon of January 18th on a charge of drunkenness and on suspicion of robbery, and on the morning of the 20th, within the two days maximum time set forth by Penal Code, section 825, he was brought into court and pleaded guilty to drunkenness. There is nothing in the record to suggest that he requested representation by counsel. The fact that he was not given the benefit of counsel at the time the confession was made does not render it involuntary or inadmissible. (*People* v. *Pongetti*, 72 Cal.App.2d 749, 752 [165 P.2d 479].)

The defendant next contends that the court erred in refusing to admit the testimony of a witness, Jack Ellis, who, defendant claims, was subjected to the same purported cruel treatment as was administered to him. In the offer of proof defendant's attorney stated that he would show that Ellis was confined in the city jail a week after defendant and he proposed to establish that the same officers administered the same treatment to Ellis as they did to the defendant. The objection to the admission of the testimony of Ellis as being irrelevant and immaterial was sustained by the court and we see no prejudicial error in the ruling.

The contention that the judgment and verdict are contrary to law and evidence is without merit. Defendant had a full and fair trial. He was represented by able counsel at all stages of the court proceedings and the record contains evidence which is amply sufficient to sustain the conviction of murder in the first degree.

Judgment and order are affirmed.

Barnard, P. J., and Griffin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 2, 1950.